STATE of Missouri ex rel. Chris
KOSTER, Relator,

v.

The Honorable Warren McELWAIN, Circuit Judge of DeKalb County, and Julie Whitsell, Circuit Clerk DeKalb County Circuit Court, Respondents.

No. WD 73211.

Missouri Court of Appeals,
Western District.

March 29, 2011.

As Modified May 3, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 3, 2011.

Application for Transfer Denied
June 28, 2011.

226

Stephen D. Hawke, Jefferson City, MO, for relator.

Sean D. O'Brien and Bronwyn Werner, Kansas City, MO, for Respondents.

Before Writ Division: CYNTHIA L. MARTIN, Presiding Judge, MARK D. PFEIFFER, Judge and GARY D. WITT, Judge.

CYNTHIA L. MARTIN, Judge.

This is an original proceeding in certiorari to review the Honorable Warren McElwain's entry of a writ of habeas corpus to Dale Helmig.[1] Dale Helmig was convicted in March 1996, following a jury trial in Gasconade County of the first degree murder of his mother, Norma Helmig, whose body was recovered on Sunday, August 1, 1993, from the swollen flood waters at the confluence of the Maries and Osage Rivers. Dale Helmig was sentenced to life in prison without parole.

The habeas court, following an evidentiary hearing, issued a writ of habeas corpus vacating Dale Helmig's conviction.

Although the writ of habeas corpus vacated Dale Helmig's conviction, it did not exonerate Dale Helmig. Dale Helmig remains a charged suspect in the murder of his mother eligible for retrial. The writ of habeas corpus ordered that Dale Helmig "be discharged from imprisonment for said conviction unless he is retried in Missouri circuit court for said offense within 180 days" of the writ of habeas corpus.[2]

■■■ We refuse to quash in part and quash in part the record of the circuit court which granted the writ of habeas corpus.[3]

### Procedural History—the Writ of Habeas Corpus

#### The DeKalb County Habeas Corpus Proceedings

Dale Helmig filed a Petition for Writ of Habeas Corpus in the DeKalb County Circuit Court on July 17, 2009, pursuant to Rule 91.

Dale Helmig's Petition for Writ of Habeas Corpus asserted six claims involving constitutional infirmities which he contends deprived him of a fair trial:[4]

---

1. We refer to Dale Helmig and to other members of the Helmig family primarily by their full names, and occasionally by only a first name to avoid confusion. No disrespect is intended.

2. The writ of habeas corpus dissolves and vacates Dale Helmig's judgment of conviction for first degree murder and returns him to the status of a pretrial detainee. *See Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Jeopardy thus does not attach to the writ of habeas corpus, leaving Dale Helmig subject to retrial, should the State so elect. *See State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 549 (Mo. banc 2003) ("As the evidence was sufficient at Amrine's

first trial to convict, however, there is no double jeopardy bar to retrial....").

3. "In certiorari, this Court is limited to either quashing or not quashing the record of the lower court." *State ex rel. Nixon v. Jaynes*, 61 S.W.3d 243, 246 n.1 (Mo. banc 2001). An appellate opinion quashing or not quashing the record of a habeas court does not, strictly, affirm or deny the writ of habeas corpus, and thus does not implicate Rule 91.04(a)(4) or Rule 91.22. *Id.*

4. Dale Helmig's habeas corpus claims will be referred to as "Claims" or where appropriate as "Claim ____" with the appropriate Claim number inserted in the blank.

**Claim No. 1:** Trial counsel was ineffective for failing to present the jury with the complete context of Dale Helmig's out-of-court statements, including evidence that Ted Helmig[5] threatened and abused his wife prior to her murder, which explains Petitioner's [Dale Helmig's] allegedly premature suspicion that his missing mother was the victim of foul play.

**Claim No. 2:** Trial counsel was ineffective for failing to present persuasive defense evidence that [Norma Helmig] was going through a bitter divorce from her abusive husband, failed to rebut any of the false evidence and assumptions on which the State relied, and failed to present evidence corroborating [Dale Helmig's] statement that he slept in a Fulton, Missouri, hotel room the night his mother disappeared.

**Claim No. 3:** The prosecutor engaged in repeated instances of misconduct, including:

A. Failure to disclose evidence that [Norma Helmig] asked Sheriff Fowler to protect her from her abusive husband three months before she was murdered, and that Tina Ridenhour told the prosecution that [Norma Helmig] armed herself with a pistol out of fear of her husband.

B. The State knowingly presented false testimony that Dale threw hot coffee in his mother's face on the Sunday before she was murdered.

C. The State presented false evidence that Petitioner tacitly admitted to Trooper Robert Westfall that he killed his mother.

D. The State improperly argued [Dale Helmig's] failure to participate in a crime scene investigation proved con-

sciousness of guilt, knowing that Deputy Paul Backus ordered him to stay away.

**Claim No. 4:** The issue of trial counsel's ineffectiveness should be reopened in light of trial counsel's drug-related conviction.

**Claim No. 5:** New evidence that checks recovered from [Norma Helmig's] purse didn't clear the bank until after her death establishes that someone other than Petitioner took her purse on the night of her murder and threw it in the water some time later.

**Claim No. 6:** During deliberations, jurors obtained a map of unknown origin that was used to persuade one or more hold-out jurors to vote guilty.

Dale Helmig's Claims were procedurally defaulted, as they had been previously raised in a Rule 29.15 motion filed by Dale Helmig, or they related to matters that should have been raised at trial, on direct appeal, or in his Rule 29.15 motion.

Dale Helmig claimed that the habeas court was nonetheless permitted to review his procedurally defaulted claims because: (1) he could establish by a preponderance of the evidence, and based on "new evidence," the probability that no reasonable juror would have convicted him (a "gateway claim of innocence"); and (2) he could establish that certain of his Claims were procedurally defaulted due to circumstances not fairly attributable to him (a "gateway cause and prejudice claim"). Dale Helmig also argued that he could establish by clear and convincing evidence a freestanding claim of innocence independently warranting issuance of a writ of habeas corpus.

On September 10, 2009, the Honorable Warren McElwain entered an Order to Show Cause why a writ of habeas corpus should not enter. Judge McElwain there-

---

5. Ted Helmig was Norma Helmig's estranged husband and is Dale Helmig's father.

after determined that Claims 1, 2, and 4 had been previously adjudicated by the Missouri Court of Appeals, Eastern District as a part of Dale Helmig's Rule 29.15 proceeding, and could not be revisited.[6] He thus dismissed Claims 1, 2, and 4 without prejudice to Dale Helmig's ability to re-file the Claims in the Missouri Court of Appeals. Judge McElwain determined that Claims 3, 5, and 6 were Claims that had not been adjudicated in the Rule 29.15 proceeding, permitting review of the Claims if a procedural gateway could be established. Judge McElwain also permitted Dale Helmig to file a First Amended Petition for Writ of Habeas Corpus to add **Claim No. 7:** that at the time of Dale Helmig's trial, Christopher Jordan, trial counsel, abused controlled substances to the degree that his professional judgment and performance were impaired and unreasonable.

An evidentiary hearing on Dale Helmig's Amended Petition for Writ of Habeas Corpus was conducted before Judge McElwain on July 6, 7, and 8, 2010, with the record left open at the conclusion of the hearing to permit the submission of additional evidence discussed by the parties. The transcripts from Dale Helmig's preliminary hearing and March 1996 trial were made a part of the habeas corpus record. The transcript from Dale Helmig's Rule 29.15 evidentiary hearing was also made a part of the habeas corpus record. The parties stipulated to the admission of the transcript of testimony taken in connection with a habeas corpus proceeding conducted in the Federal District Court, Eastern District of Missouri, relating to Dale Helmig's claim that a map that was not in evidence had been provided to the jury (Claim 6). In addition, the habeas court had the benefit of various affidavits and exhibits presented before the hearing, and the benefit of several deposition transcripts made a part of the record.

### The Writ of Habeas Corpus

Judge McElwain issued a writ of habeas corpus on November 3, 2010, accompanied by 110 pages of findings of fact and conclusions of law. The writ of habeas corpus was issued on several grounds, each of which would have independently supported issuance of the writ.

First, Judge McElwain found that the gateway of cause and prejudice had been established permitting review of Claim 3(A) (relating to the nondisclosure of Norma Helmig's reports of abuse and the non-

**6.** As we discuss, *infra,* procedurally defaulted claims can be resurrected in a habeas corpus proceeding under a gateway claim of cause and prejudice or a gateway claim of innocence. Notwithstanding, Judge McElwain believed he was prohibited from resurrecting any claim expressly considered by the Eastern District in Dale Helmig's Rule 29.15 motion. Because we uphold the writ of habeas corpus, we need not address whether claims previously raised and rejected in a post-conviction relief motion can be resurrected as a procedurally defaulted claim under Rule 91 if an appropriate "gateway" is established. We suggest, however, that under certain circumstances, it would not be impermissible to do so. *See, e.g., State ex rel. Engel v. Dormire,* 304 S.W.3d 120 (Mo. banc 2010) (holding that defendant's discovery of cumulating in-

stances where the State withheld the disclosure of evidence which could have been used to impeach a key witness permitted habeas review of defendant's claimed *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) violation pursuant to the cause and prejudice gateway even though some of the undisclosed exculpatory evidence had been previously considered and rejected in the defendant's Rule 29.15 hearing and in a federal habeas corpus proceeding); *State ex rel. Nixon v. Sheffield,* 272 S.W.3d 277, 280–81 (Mo.App. S.D.2008) (" 'In only the most exceptional cases do courts, state or federal, allow the opportunity to litigate claims after conviction *that had been previously litigated* or were defaulted and, thus, are procedurally barred.' ") (quoting *Jaynes,* 63 S.W.3d 210, 215 (Mo. banc 2001)) (emphasis added).

disclosure of the existence of Tina Ridenhour as a witness), and of Claim 6 (relating to the map being provided to the jury).[7] Judge McElwain then determined that Claims 3(A) and 6 were meritorious, and that Dale Helmig was a victim of a fundamental miscarriage of justice warranting the vacation of Dale Helmig's conviction.

Second, Judge McElwain found that Dale Helmig established the gateway claim of innocence by a preponderance of the evidence, permitting review of Claims 3(A), (B), (C), and (D), and Claims 6 and 7.[8] Judge McElwain then determined that each of these Claims was meritorious warranting the vacation of Dale Helmig's conviction.

■ Finally, Judge McElwain found that Dale Helmig established Claim 5, a freestanding claim of innocence, and held that:

> Dale Helmig has established by clear and convincing evidence that he is innocent of the crime for which he was convicted and sentenced, and that his constitutional rights were violated at his trial in the manner described above. As stated in *Amrine v. Roper*, 102 S.W.3d 541 (Mo.2003), Petitioner having met his burden, the evidence supporting the conviction must be assessed in light of all the evidence now available. There was no physical evidence linking Petitioner to the murder. The thin circumstantial evidence has been substantially weakened by the newly discovered evidence previously discussed. This case presents the rare circumstance in which no credible evidence remains from the first trial to support the conviction. This Court determines based on the record that under these rare circumstances, there is clear and convincing evidence of Dale Helmig's innocence. As such his conviction and sentence cannot stand and must be set aside.[9]

Judge McElwain issued the writ of habeas corpus and ordered that "[t]he conviction of Dale Helmig in the Circuit Court of Gasconade County, Missouri, for the first degree murder of Norma Helmig is vacated and Petitioner shall be discharged from imprisonment for said conviction, unless he is retried in Missouri circuit court for the said offense within 180 days of this order."

### The Writ of Certiorari

■ On November 22, 2010, the State filed its Petition for Writ of Certiorari in this court. We granted the writ of certiorari as a matter of right. " 'When the Attorney General seeks a writ of certiorari [following the grant of a writ of habeas corpus], the writ issues as a matter of course and of right....' " *State ex rel. Nixon v. Kelly*, 58 S.W.3d 513, 516 (Mo. banc 2001) (quoting *State ex rel. Taylor v. Blair*, 357 Mo. 586, 210 S.W.2d 1, 3–4 (1948)).

---

7. The State confirmed during oral argument that the gateway of cause and prejudice, in addition to the gateway of innocence, was relied on by the habeas court to permit review of Claims 3(A) and 6.

8. Judge McElwain thus found that Claims 3(A) and 6 were permissibly reviewed based both on the gateway of cause and prejudice and the gateway of innocence.

9. A petitioner who can establish a freestanding innocence claim by clear and convincing evidence is entitled to habeas corpus relief even if he had a fair trial. *Amrine*, 102 S.W.3d at 543. Thus, a freestanding innocence claim is unrelated to, and does not require, a claim of constitutional infirmities at trial. *Id*. It is not clear that the freestanding claim of innocence recognized in *Amrine* can be relied on in cases where the death penalty was not imposed. Because we otherwise conclude that the writ of habeas corpus should be upheld, we need not reach a definitive conclusion about the intended reach of *Amrine*.

A writ of certiorari requires an inferior court to produce a certified record of a particular case for review for irregularities. BLACK'S LAW DICTIONARY 228 (6th ed.1990). Our writ of certiorari thus ordered the Circuit Court of DeKalb County to return the record of the habeas corpus proceedings to this court for review. The record was returned on December 6, 2010.

### Standard of Review

■ Rule 91.01(b) provides that "[a]ny person restrained of liberty within this state may petition for a writ of habeas corpus to inquire into the cause of such restraint." Consideration of a petition for writ of habeas corpus is limited to determining the facial validity of the confinement. *State ex rel. Nixon v. Jaynes,* 73 S.W.3d 623, 624 (Mo. banc 2002).

■ Certiorari is "available to correct judgments that are in excess or an abuse of jurisdiction, and that are not otherwise reviewable on appeal." *State ex rel. Nixon v. Sprick,* 59 S.W.3d 515, 518 (Mo. banc 2001). However, our review is limited to a determination whether the habeas court exceeded the bounds of its jurisdiction. *Id.; see also State ex rel. Nixon v. Jaynes,* 61 S.W.3d 243, 245 (Mo. banc 2001) ("The chief purpose of certiorari is to confine an inferior court within its jurisdiction.").

■ Because of the Missouri Supreme Court's decision in *J.C.W. ex rel. Webb v. Wyciskalla,* 275 S.W.3d 249 (Mo. banc.2009), we must assess the meaning of the word "jurisdiction" in the context of our standard of review. "*Webb* established

that Missouri recognizes only two types of jurisdiction: personal and subject matter, both of which derive from constitutional principles relating to the circuit court's ability to exercise power over particular persons and categories of cases." *State ex rel. Koster v. Jackson,* 301 S.W.3d 586, 589 (Mo.App. W.D.2010). As in *Jackson,* the State here "does not challenge the personal or subject matter jurisdiction" of the habeas court.[10] *Id.* Rather, the State challenges the "authority ... of the court to resolve" Dale Helmig's Claims. *Id.* As a result of *Webb,* "jurisdictional competence," which has no constitutional underpinning, is no longer recognized as a basis for attacking an inferior court's "jurisdiction." *Webb,* 275 S.W.3d at 254. We thus view the State's Petition for Writ of Certiorari as questioning whether the habeas court exceeded its authority to grant habeas relief or abused its discretion in issuing the writ of habeas corpus. *Jackson,* 301 S.W.3d at 589.

■ Our review of whether the habeas court exceeded its authority or abused its discretion in granting habeas relief is limited to a review of questions of law presented by the record before the habeas court. *Sprick,* 59 S.W.3d at 518. An abuse of discretion occurs only when "the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Stewart,* 313 S.W.3d 661, 665 (Mo. banc 2010).

---

10. In fact, there would be no basis for such a challenge. The DeKalb County Circuit Court possessed personal jurisdiction over the habeas proceedings, as Dale Helmig is incarcerated in the State of Missouri, and was the proper venue, as Dale Helmig is incarcerated in DeKalb County, Missouri. Rule 91.02(a). The DeKalb County Circuit Court had subject matter jurisdiction over the habeas proceedings pursuant to Mo. Const. art. V, section 14(a), which affords circuit courts in Missouri original (albeit non-exclusive) jurisdiction over remedial writs.

 We do not review findings of fact. *Sprick*, 59 S.W.3d at 518. However, the sufficiency of the evidence to support the writ of habeas corpus as a whole is a question of law subject to certiorari review. *Id.* "[E]very lawful intendment will be made in favor of the determination and the regularity of the proceeding below." *State ex rel. Shartel v. Skinker*, 324 Mo. 955, 25 S.W.2d 472, 478 (1930). Upon the completion of our review, our options are to "either quash the writ or to uphold the actions of the habeas court," *Jackson*, 301 S.W.3d at 589, "in whole or in part." *State ex rel. White v. Swink*, 241 Mo.App. 1048, 256 S.W.2d 825, 827 (1953).[11]

 Where, as here, several avenues permitting habeas corpus review and several Claims of constitutional infirmities were found to have merit, we need only determine that at least one avenue permits habeas review, and that at least one Claim has merit. **A writ of habeas corpus does not declare or determine the guilt or innocence of a defendant. A writ of habeas corpus merely operates to vacate a conviction where principals of justice and fundamental fairness require, permitting the State to retry the defendant should it so elect.** *Schlup v. Delo*, 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("[H]abeas corpus is, at its core, an equitable remedy."). It is thus immaterial whether *all* of the grounds relied upon by the habeas court in fact support the issuance of the writ of habeas corpus. The effect of the writ of habeas corpus will be the same whether one or several grounds for its issuance are determined by this court to warrant upholding the actions of the habeas court.

*The Evidence in the Habeas Record*

Consistent with our standard of review, we have thoroughly reviewed the habeas corpus record. We summarize the habeas corpus record pertinent to our decision to uphold the issuance of the writ of habeas corpus. That includes a summary of the evidence presented at Dale Helmig's trial, a summary of the procedural events following Dale Helmig's conviction, and a summary of the evidence presented during the habeas corpus proceedings.

*The Evidence Presented during the March 1996 Trial*[12]

 Norma Helmig's body was found at the confluence of the Maries and Osage Rivers in Osage County, Missouri, on Sunday, August 1, 1993, during the Great Midwest Flood. Her body was found wearing only a nightgown and undergarments, with a concrete cinder block attached by a rope to her torso.

Norma Helmig was last seen at 12:30 a.m. on Thursday, July 29, 1993, at a Country Kitchen restaurant in Jefferson City, Missouri, where she had dined alone, according to her waitress, Carol McKinney. Immediately prior, Norma Helmig played Bingo at the American Legion Hall on Tanner Bridge Road in Jefferson City with her sister, Dorothy Bauer, a Wednesday night routine.

Norma Helmig returned to her home on Pointer's Creek in Osage County, south and east of Jefferson City, in the early morning hours of Thursday, July 29, 1993. The time of her return home is not clear.

Dale Helmig occasionally stayed with his mother at the home on Pointer's Creek, a

---

11. See footnote 3.

12. Because we uphold the actions of the habeas corpus, which has the effect of vacating Dale Helmig's conviction, our discussion of the evidence presented at trial, and/or in the habeas corpus proceeding, does not constitute "law of the case" and will not bind either the State or Dale Helmig to "factual findings" should the State elect to retry Dale Helmig.

pattern established in the months preceding Norma Helmig's death and after Ted Helmig, Norma Helmig's estranged husband, moved out of the marital home. At the time of Norma Helmig's death, Norma and Ted Helmig were in the midst of contested dissolution of marriage proceedings.

On Wednesday, July 28, 1993, Dale Helmig had been painting the Pizza Works in Holt's Summit, north of the Missouri River from Jefferson City. Alex Bauer, Dale Helmig's uncle, testified that Dale Helmig called while Norma Helmig and Dorothy Bauer were out playing Bingo looking for his mother, and indicating he was going to go home. At that time, Dale Helmig's "home" was Norma Helmig's house. Alex Bauer described Dale Helmig as sounding "excited or irrational." Though Dale had planned to go home that evening, flood waters washed a leaking propane tank against the base of the Missouri Highway 54 Bridge over the Missouri River at around 8:00 a.m. that morning, forcing its closure. As a result, Dale Helmig decided to stay in Fulton, Missouri, for the evening, and checked into the Travelier Motel. Dennis Hazelwood, a pizza delivery man for Mazzio's Pizza in Fulton, delivered a pizza to Dale Helmig in Room 49 at the Travelier Motel at around 10:30 p.m. Mr. Hazelwood observed a white Buick parked outside Room 49. Dale Helmig drove a white Buick.

John Lilleston of Jefferson City checked in to the Travelier Motel and was given Room 43. Mr. Lilleston left the motel at 5:00 a.m. on Thursday, July 29, 1993. He testified at trial on direct examination that he did not notice a white Buick parked outside of Room 49 when he left.

Dale Helmig reported that he slept Wednesday night in his hotel room in Fulton and checked out of the hotel on Thursday, July 29, 1993. He reported that he drove back to Holt's Summit at about 9:30 a.m. where he looked for a friend who was supposed to paint with him that day. He reported that he then drove across the Highway 54 Bridge and went to La Casa Restaurant on Missouri Boulevard in Jefferson City.

On Thursday, July 29, 1993, Dorothy Bauer called Norma Helmig's home but could not reach her. Sometime that morning, Dale Helmig called his Aunt Dorothy. He told her he had been unable to reach his mother. Dale Helmig asked Dorothy Bauer to relay a message to his mother that he planned to come home later.

Dale Helmig went to a bar in Jefferson City called The Jungle on Thursday evening, July 29, 1993. He encountered an acquaintance, Stacey Medlock. Dale Helmig decided to spend the night with Stacey Medlock at a motel in Eldon, Missouri.

On Friday morning, July 30, 1993, Mrs. Bauer again called her sister's home but received no answer. She got a message to Velda Party, Norma Helmig's cousin, who lived about three miles from Norma Helmig. Velda Party drove to Norma's house. She found Norma's car in the carport but received no answer when she knocked on the door. Mrs. Party called Dorothy Bauer. Mrs. Bauer suggested that Mrs. Party go back to Norma's house because "something's wrong if her car is there and she doesn't answer the door."

On Friday morning, July 30, 1993, Dale Helmig invited Stacey Medlock to come with him to his mother's home. Dale Helmig had explained to Ms. Medlock that he was going to have his kids for the weekend and that a barbeque was planned at his mother's. He was very excited at this prospect as he had not seen his kids in a while because of disputes he was having with his estranged wife. Dale Helmig and Stacey Medlock arrived at Norma Hel-

mig's home at around noon. Dale Helmig determined that his mother was not there. He led Ms. Medlock into the house and remarked that the air conditioner had been left on, which his mother would never do, and that a small fan had been knocked over.

Mrs. Party and her husband arrived at Norma Helmig's home shortly after Dale Helmig and Stacey Medlock. The four walked out of the house, accidentally locking the door behind them. Dale Helmig noticed a window with a loose screen and commented that a large box fan he had installed in the window a few weeks before was gone.

Dale Helmig called several relatives looking for his mother, including Mrs. Bauer. Dale Helmig told Mrs. Bauer that his mother was missing and that a fan was missing from a window. At trial, Ms. Bauer testified that Dale Helmig mentioned that some of his mother's nightgowns were missing.

Mr. and Mrs. Bauer drove to Norma Helmig's house. Dorothy Bauer noticed that the clothing her sister had been wearing when she last saw her on Wednesday, July 28, 1993, at the American Legion Hall was in the bedroom. At trial, Mrs. Bauer testified that Dale Helmig again mentioned that some of his mother's nightgowns were missing and mentioned a gold chain. Alex Bauer testified that Dale Helmig mentioned that his mother's purse was missing.

Dale Helmig called the police. Deputy Paul Backus of the Osage County Sheriff's Department was dispatched to Norma Helmig's home. Dale Helmig told Deputy Backus that he had been staying with his mother but had been gone for several days until returning at noon that same day. Dale Helmig told Deputy Backus that when he arrived, the air conditioner was on and that his mother did not typically leave the air conditioner on when she left the house. Dale Helmig pointed out the missing window fan, a scuff mark on the house below the window where the fan had once been, the small fan knocked over in the living room, a wood stove that was moved a few inches off of its base, and pillows stuffed between the bed and nightstand. At trial, the State argued that Dale Helmig's behavior at the scene evidenced guilt because Dale Helmig was too quick to conclude that something had happened to his mother.

Sheriff Carl Fowler was called to the scene by Deputy Backus. Sheriff Fowler testified that Dale Helmig told him that his mother's purse, her keys, and a nightgown were missing.

Dale Helmig and Stacey Medlock left Norma's home while Sheriff Fowler and Deputy Backus were on the scene. Dale Helmig needed to return Ms. Medlock to Jefferson City and needed to make different arrangements for picking up his children. Stacey Medlock testified at trial that during the drive back to Jefferson City, Dale Helmig seemed worried and at one point said "someone must have gotten crazy drunk and killed her." After dropping Stacey Medlock off, Dale Helmig called his estranged wife. Teresa Helmig testified that during the call Dale Helmig discussed his mother's disappearance and mentioned that her purse, keys, and a nightgown were missing. He also mentioned the missing window fan and that his theory was that someone came in through the window. At trial, Teresa Helmig testified that "there were a couple comments made" and that Dale Helmig then angrily stated "are you trying to say I killed my own mother?" The State argued that the statements Dale Helmig made to Stacey Medlock and to Teresa Helmig evidenced guilt as they suggested Dale Helmig already knew that his mother was dead.

On Saturday, July 31, 1993, the police conducted an aerial search over Norma Helmig's home and up and down the Gasconade River. Mrs. Bauer testified that Dale Helmig was not at the house on Saturday. At trial, the State emphasized Dale Helmig's absence from his mother's home during the search efforts on Saturday, July 31, 1993, as evidence of his guilt and as inconsistent with his expressions of worry and concern the day before.

On Sunday, August 1, 1993, Robert Steele and his son Jerry were using their boat to check on property they owned near the Mari–Osa Delta, located at the confluence on the Maries and Osage Rivers. They noticed a body floating in the trees along the riverbank, about 100–150 yards from the Delta. The body was later identified by dental records as Norma Helmig.

On Sunday afternoon, and before the body had been positively identified, Sheriff Fowler gathered the family, including Ted Helmig, at Norma Helmig's home to report the discovery. Many of the family members responded emotionally and began crying. Sheriff Fowler testified that Dale Helmig did not cry. Sheriff Fowler said Dale Helmig looked surprised and began tapping his foot rapidly on the ground. At trial, the State suggested Dale Helmig's reaction evidenced guilt.

Mrs. Bauer testified that Sheriff Fowler "asked if anyone could identify the clothing, the gown" that Norma Helmig might have been wearing when she disappeared. According to Mrs. Bauer, Dale Helmig advised he believed his mother would have been wearing her white nightgown with blue flowers on it. Sheriff Fowler testified that he had no recollection of asking anyone about what Norma Helmig might have been wearing at the time he met with the family on Sunday, August 1, 1993. None-

theless, the State argued that Dale Helmig was the first to mention that Norma Helmig disappeared in the very nightgown she was wearing when found, and that this knowledge suggested guilt as it indicated Dale Helmig knew too much about the crime.

In the evening of Sunday, August 1, 1993, Dale Helmig voluntarily went to the Sheriff's Department at Sheriff Fowler's request. Dale Helmig was Mirandized [13] and agreed to provide a written statement. In his written statement, Dale Helmig described his activities during the preceding week. At trial, the State argued that Dale Helmig had not been instructed to account for his activities throughout the week, and that by doing so, he was evidencing guilt by the need to establish an alibi.

Norma Helmig's stomach contents were consistent with the meal she had reportedly consumed at the Country Kitchen in the early morning hours of Thursday, July 29, 1993. This permitted an expert to opine that the time of death was between 4:00 a.m. and 6:00 a.m. on Thursday, July 29, 1993. The cause of death was officially noted as undetermined, though asphyxiation was opined to be the likely cause. The State argued that Dale Helmig had no alibi for the time frame of Norma Helmig's death.

On Saturday, July 31, 1993, before Norma Helmig's body had been found, Sheriff Fowler testified that he got keys to Norma Helmig's car from Ted Helmig and that he opened the trunk of the car. Inside, he saw a white sheet, grass seed, and human hairs. Sheriff Fowler impounded the car. The hairs found in Norma's trunk were analyzed and determined to be consistent with hairs found in Norma Helmig's hair brush. The State suggested at trial that Norma Helmig was transported to the riv-

13. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

er in the trunk of her own car and thrown from a bridge with a concrete block tied to her body.

On February 17, 1994, a purse and its contents were discovered by a farmer in a farm field about a half-mile north of the Missouri River and about a mile and a half east of the Highway 54 Bridge at Jefferson City. Sheriff Fowler and Deputy Backus investigated the scene. They found check-books, papers, a wallet, two sets of keys, and some jewelry, including a gold chain, in or near the purse. The purse belonged to Norma Helmig. At trial, a hydrologist opined that the purse had been tossed into the river somewhere along Highway 63, most likely from the Highway 63/54 Bridge outside of Jefferson City. At trial, the State argued that Dale Helmig threw the purse off the bridge in the early morning hours of Thursday, July 29, 1993, after murdering his mother and on his return to the Travelier Motel in Fulton. The State also argued that Dale Helmig was the first to mention his mother's missing purse, keys, and gold chain, and that it was not a coincidence that all of those "missing" items had been found in or near the purse.

Shortly after the purse was found, a warrant was issued for Dale Helmig's arrest. Sheriff Fowler testified that it was his opinion that because contents in the purse had been reported missing by Dale Helmig, finding the purse with those miss-ing items indicated excessive knowledge on Dale Helmig's part before Norma Helmig's murder was established. Dale Helmig was arrested in the early morning hours of March 6, 1994.[14]

Dale Helmig was questioned by Trooper Robert Westfall of the Missouri Highway Patrol by agreement with Sheriff Fowler. Dale Helmig told Trooper Westfall that Sheriff Fowler "was responsible for all of this" and that he [Dale Helmig] knew who had killed his mother "but no one could prove it." Trooper Westfall told Dale Hel-mig that he had "lost his own mother a couple of years ago," though his mother was actually still alive. He then told Dale Helmig that he felt his mother was watch-ing over him and that he spoke with her regularly. Trooper Westfall told Dale Helmig that "his [Dale Helmig's] mother was watching him, and that if he wished, he could speak to her also." Dale Helmig began to sob, leaned forward in his chair and said, "I'm sorry, I'm just sorry." Trooper Westfall testified at trial that Dale Helmig never denied killing his moth-er. The State argued that Dale Helmig's conduct during his interactions with Trooper Westfall evidenced his guilt.

Dorothy Bauer testified that after Ted Helmig moved out of Norma's house and Dale Helmig moved in, Norma Helmig seemed nervous and upset a lot. Mrs. Bauer said she observed several argu-ments between Dale Helmig and Norma Helmig. Mrs. Bauer said that she saw Norma and Dale Helmig argue about a phone bill not long before her death. Dor-othy Bauer claimed that Norma Helmig was fearful of Dale Helmig. The State argued at trial that Dale Helmig's motive to kill his mother was her growing irrita-tion with him about money and her deci-sion to "cut him off."

On cross-examination, Sheriff Fowler ac-knowledged having a copy of a police re-port from the Jefferson City Police De-partment regarding a complaint filed by Norma Helmig against Ted Helmig for throwing coffee in Norma Helmig's face at the Country Kitchen in Jefferson City in the early morning hours of July 11, 1993. The report noted that Ted Helmig said to

14. Though Dale Helmig was arrested and charged in Osage County, the venue for Dale Helmig's trial was moved to Gasconade County.

Norma, "I'm going to have an end to this once and for all."

On cross-examination, Sheriff Fowler acknowledged that during the preliminary investigation into Norma Helmig's disappearance, Ted Helmig told him on two occasions that he and Norma had still been having sexual relations periodically. Sheriff Fowler testified that he did not know Norma Helmig but knew "of" her, though he had talked with her a few times after she and Ted Helmig filed for divorce. He did not indicate the nature of those conversations.

On redirect examination, Sheriff Fowler testified that neither he nor any of his deputies had ever been called out on a domestic disturbance call involving Norma and Ted Helmig. In addition, in response to the State's questioning on redirect, the following exchange took place:

Q. Mr. Jordan asked you some questions about altercations. Have you become aware that Dale Helmig had an altercation with his mother?

A. Yes.

Q. Where?

A. Country Kitchen.

Q. When?

A. The Sunday before her death.

Dale Helmig's trial counsel did not object to this line of questioning.[15]

At trial, the State called Carol McKinney, the Country Kitchen waitress who waited on Norma Helmig on Wednesday, July 28, 1993, as a witness. During the State's direct examination, the following exchange occurred:

Q. Do you recall an incident a few days before the 28th of July involving the defendant and Norma Helmig?

A. Yeah, there was an incident at Country Kitchen with that.

Q. What do you know about this particular incident?

A. What I know about it is one of the other waitresses that was waiting on Norma came back in the galley and said her son had just threw coffee in her face.

Dale Helmig's hearsay objection was sustained.

The defense presented the testimony of six witnesses. The defense's theory was that the State had failed to prove the "corpus delicti" of murder. Defense counsel put on evidence that Norma Helmig had a prescription drug and alcohol addiction and that she was suffering from painful medical conditions. The defense created the implication that Norma Helmig may have died of natural causes and/or by an

15. This was the first of several references by the State to an alleged incident involving Dale Helmig and his mother which purportedly involved Dale Helmig throwing hot coffee in his mother's face at the Country Kitchen on the Sunday preceding her death. The State late endorsed Darla Toebben Voss as a witness on the morning of trial. The State advised that Ms. Voss, a waitress at the Country Kitchen, had observed this incident first hand. However, the State had not yet located or talked to Ms. Voss, and was relying on the report of another waitress, Carol McKinney, that Ms. Voss had reported the incident. Ms. McKinney's testimony about what Ms. Voss told her was obvious hearsay. The State was thus expressly instructed by the trial court on the morning of trial that it was not to mention the incident, or to in any manner discuss the incident, in front of the jury "until you are sure [Darla Voss is] going to provide the testimony you're going to represent to them." Notwithstanding this instruction, the State raised the alleged incident between Dale Helmig and his mother at the Country Kitchen at least three times during witness examinations and once during closing argument. The State never called Darla Toebben Voss to testify, and afforded the habeas court with no evidence suggesting that it ever located Ms. Voss.

accidental or purposeful overdose, a strategy the trial court noted on the record (though outside the hearing of the jury) to be "ridiculous." Lab reports presented to the jury revealed no drugs in Norma Helmig's system. In addition, Norma Helmig's body was found weighted down with a concrete cinder block tied to her torso.

The defense also called Officer Douglas Shoemaker, the Jefferson City police officer who prepared the report of the incident at the Country Kitchen which occurred in the early morning hours of July 11, 1993, where Ted Helmig threw hot coffee in Norma Helmig's face and threatened her.[16] On cross-examination, the State asked Officer Shoemaker whether he was the officer who had investigated a *similar* incident at the Country Kitchen involving Dale Helmig, thus suggesting that the incident between Dale Helmig and his mother had, in fact, occurred.[17]

The State presented no direct evidence linking Dale Helmig to the crime and no physical evidence implicating Dale Helmig. The State acknowledged during its opening statement and in closing argument that its case against Dale Helmig was based solely on circumstantial evidence. The State argued that its circumstantial evidence fell into three categories: (i) Dale Helmig and his mother had argued over a phone bill and otherwise about money; (ii) Dale Helmig was too quick to suspect foul play in his mother's disappearance and "knew too much" about what were later determined to be the circumstances of her murder; and (iii) Dale Helmig made statements following his mother's disappearance giving rise to a suspicion of guilty knowledge.

On March 9, 1996, following a five day jury trial, and after five hours of deliberations, Dale Helmig was convicted of first degree murder in the death of his mother. He was sentenced to life in prison without parole. He began serving his sentence at the Crossroads Correctional Center in Cameron, DeKalb County, Missouri. Dale Helmig was released on bail on December 13, 2010, following issuance of the writ of habeas corpus and pending further proceedings pursuant to Rule 91.14.

### The Direct Appeal and Post Conviction Proceedings

Dale Helmig appealed his conviction. His conviction was affirmed by per curiam opinion. *State v. Helmig*, 950 S.W.2d 649 (Mo.App. E.D.1997).

Dale Helmig filed a timely post-conviction motion under Rule 29.15 which focused on claims of ineffective assistance of counsel. The motion court overruled the motion. The motion court's judgment was affirmed on appeal. *Helmig v. State*, 42 S.W.3d 658 (Mo.App. E.D.2001).

Dale Helmig filed a Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of Missouri. The Honorable David Noce ordered a new trial on the grounds that during deliberations, the jury was given a map, which had not been received into evidence, and which was requested in an effort to persuade one or more "hold-out" jurors to change their votes from not guilty to guilty. *Helmig v. Kemna*, No. 4:02 CV 574 DDN, 2005 WL 2346954 (E.D.Mo. Sept. 26, 2005). The Eighth Circuit Court of Appeals reversed, finding

---

**16.** The police report prepared for the incident involving Ted Helmig reported that Ted Helmig threatened Norma Helmig by saying "I am going to have an end to this once and for all."

**17.** Dale Helmig's counsel did argue in closing that the only time hot coffee had been thrown at Norma Helmig at the Country Kitchen was when Ted Helmig did so shortly before Norma Helmig's death.

"the district court erred in applying the presumption of prejudice without taking into account that this is a habeas case." *Helmig v. Kemna,* 461 F.3d 960, 963 (8th Cir.2006), *cert. denied,* 550 U.S. 922, 127 S.Ct. 2137, 167 L.Ed.2d 870 (2007).

Dale Helmig then filed a Petition for Writ of Habeas Corpus in the Missouri Supreme Court, suggesting that it would be impractical to proceed in a lower court because potentially available remedies could involve courts situated in different appellate districts. On June 29, 2009, the Missouri Supreme Court denied that petition without prejudice to Dale Helmig's ability to proceed with a petition for writ of habeas corpus in the Circuit Court of DeKalb County.

### Evidence Presented During the Habeas Corpus Proceedings[18]

During the habeas proceeding, Ted Helmig testified that when Norma Helmig filed for divorce, she secured a protective order against him based on allegations that he had physically and emotionally abused her. Ted Helmig admitted being involved in an altercation with Norma Helmig on July 11, 1993. On that occasion, he showed up at the Country Kitchen where Norma was eating. Ted Helmig admitted that he "got into it" with Norma and threw a glass of water into her face. They were arguing at the time over money.

Ted Helmig admitted that he had been at the American Legion Hall on Wednesday, July 28, 1993, and that he had seen Norma Helmig that evening having a drink in the bar with another man, Bud Becker. Though he denied going to Norma Helmig's house on Wednesday, July 28, 1993, or in the early morning hours of Thursday, July 29, 1993, he volunteered that he would still go to Norma's house occasionally following their separation and that "she would let me come in once in awhile." Ted Helmig claimed that after he left the American Legion Hall on Wednesday, July 28, 1993, he went to his apartment by himself and acknowledged that no one would be able to verify his whereabouts during the time frame of Norma Helmig's murder. Ted Helmig acknowledged that at the time of Norma Helmig's murder, he still had keys to the house on Pointer's Creek.

At some point before Norma Helmig's body was found, Ted Helmig sought out Sheriff Fowler to tell him that he and Norma Helmig had sex in Norma Helmig's bed on more than one occasion shortly before her disappearance. He denied that his purpose in reporting this information to Sheriff Fowler was a concern the Sheriff would find evidence placing him in Norma Helmig's bedroom. On Sunday, August 1, 1993, the day Norma Helmig's body was found, Ted Helmig was at Norma's house when Sheriff Fowler came to meet with the family. He testified he absolutely did not cry when he learned a body had been found in the river. He did, however, ask Sheriff Fowler if the body was mutilated. That evening, Ted Helmig went to the Sheriff's Department to talk to Sheriff Fowler at the Sheriff's request. Sheriff Fowler told Ted Helmig that he

---

18. The habeas court heard some evidence which had also been presented during the original trial. We do not intend to suggest by our summary that all of the evidence heard by the habeas court on the record during the habeas proceedings was "new evidence," a legal term the scope of which we need not define in this opinion. As we otherwise uphold the actions of the habeas corpus, we need not address the gateway of innocence, which requires, as a predicate, the establishment of "new reliable evidence" warranting review by the habeas court of all evidence, old and new, pertaining to the potential guilt or innocence of a habeas petitioner. *House v. Bell,* 547 U.S. 518, 537, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (quoting *Schlup,* 513 U.S. at 327–28, 115 S.Ct. 851).

"ought to be his number one suspect" but that he wasn't.

After Norma Helmig's murder, her mail was held at the post office. Ted Helmig testified that he retrieved Norma Helmig's mail from the post office on several occasions in the two to four week period immediately following her death. Ted Helmig admitted opening Norma Helmig's mail and going through the mail. The mail included a bank statement enclosing cancelled checks. Ted Helmig admitted he was trying to see where Norma Helmig had been getting her money because "she wasn't getting no money from me and she wasn't working."

Ted Helmig knew that Norma Helmig had approximately $22,000 in the bank. As a result of Norma Helmig's death, Ted Helmig received all of this money, the house on Pointer's Creek, and all other jointly owned assets which would otherwise have been divided as a part of the divorce.

Patty Rogers (formerly Patty Helmig) [19] testified. Ms. Rogers was married to Dale Helmig at the time of his trial—they married after his arrest. After her husband's conviction, she and the baby daughter she had with Dale Helmig lived temporarily with Ted Helmig. Mrs. Rogers saw Ted Helmig intoxicated on several occasions. When he was intoxicated, he would talk to himself. Ms. Rogers heard Ted Helmig say, "I'm sorry. I didn't mean to hurt you. I didn't mean for this to happen." Ms. Rogers spoke with law enforcement about what she had heard Ted Helmig say. As a result of those reports, she moved out of Ted Helmig's house. She testified that Sheriff Fowler told her to move out "or I

would be the next one he would pull out of the river."

Tina Ridenhour testified by deposition. She testified that she and her family were camping in an area consumed by floodwaters on July 7, 1993. They were stranded. Norma Helmig noticed them and invited them into her home to stay with her until the waters receded. While they were at Norma's house, they observed that Norma acted very nervous, and she had a handgun with her at all times. Tina Ridenhour testified that Norma received several phone calls while they were there. Norma Helmig told Tina Ridenhour that the calls were from her son. The son called numerous times—at least a dozen or more. The tenor of the conversations was always friendly, not fearful. During the course of the evening, Norma Helmig talked about her husband, Ted Helmig. Norma advised that she was in the process of getting a divorce and that her husband was not very nice and liked to smack people around. At one point she received a call that upset her, though Tina Ridenhour did not know from whom. Norma Helmig seemed aggravated and fidgety after the call and started checking the windows. She finally said, "We're safe. We can't get out. He can't come in."

Mrs. Ridenhour later learned that Norma Helmig had been murdered by reading an account in a newspaper. She contacted the authorities with the help of her father-in-law. She believed that she spoke with the Osage County Sheriff [Sheriff Fowler]. Whomever she spoke with identified himself as "law enforcement." She reported to the person she spoke with what her family had experienced at Norma Helmig's home.

---

**19.** Patty Rogers is the mother of a child with Dale Helmig who was born shortly before Dale Helmig's trial. For clarification, we note that Teresa Helmig is the mother of two other children with Dale Helmig. It is these two older children Dale Helmig was planning to have visitation with over the weekend following his mother's disappearance.

Deputy Backus testified. Deputy Backus prepared a report of the items Dale Helmig told him were missing from the home. At the habeas hearing, Deputy Backus testified that "if things had been mentioned . . . as missing from the house," he would have made note of that in his report. He admitted that the report he made following the investigation on Friday, July 30, 1993, made no mention of a gold chain having been reported as missing by Dale Helmig.

Deputy Backus assisted in the recovery of Norma Helmig's purse when it was discovered in February 1994. He catalogued the contents of the purse that were recovered. The contents included cancelled checks and, specifically, cancelled check number 1251.[20] Deputy Backus said that he made no attempt to determine when the cancelled checks had cleared the bank in relation to Norma Helmig's death.

Sheriff Fowler testified at the habeas proceeding. He testified that Norma Helmig had made allegations of physical violence against Ted Helmig while their divorce proceedings were pending. He acknowledged that Norma Helmig reported "safety concerns" to him in person and on the phone "at various times" and "on multiple occasions." Sheriff Fowler estimated he was contacted between five and fifteen times by Norma Helmig after her separation from Ted Helmig in the spring of 1993, principally between February and March, and then again between June and July.[21] Sheriff Fowler acknowledged that Norma Helmig asked him about the procedure for securing a handgun. None of

Norma Helmig's complaints were ever reduced to a written police report.

Sheriff Fowler testified that the alleged report that Dale Helmig had thrown hot coffee in his mother's face at the Country Kitchen on the Sunday preceding her death could not be substantiated.

Sheriff Fowler testified about the recovery of Norma Helmig's purse. He acknowledged recovering cancelled checks in or near the purse. Sheriff Fowler acknowledged check number 1251 cleared the bank on July 30, 1993, after Norma's death, and is itemized on Norma Helmig's bank statement for the period from July 12, 1993, to August 9, 1993.

Sheriff Fowler testified that the discovery of the purse had been very significant, and gave rise to Dale Helmig's arrest. He testified that it was his theory that whoever murdered Norma Helmig took her purse and threw it off the bridge.

Dwayne Muck testified by deposition. He worked with Exchange Bank, Norma Helmig's bank. He verified that cancelled check number 1251 cleared the bank on July 30, 1993, and would have been included in a bank statement mailed to Norma Helmig sometime after August 9, 1993, the cut off for the applicable statement period. Thus, this bank statement would have been mailed to Norma Helmig (along with the cancelled checks, including check number 1251), on or after August 9, 1993, and thus several days after Norma Helmig's death.

---

**20.** As best we can discern, most of the cancelled checks, including check number 1251, were not introduced into evidence during Dale Helmig's trial, as neither Dale Helmig nor the State appreciated at the time the significance of this evidence on the issue of "when" the purse was thrown into the river.

**21.** Norma Helmig lived with her sister, Dorothy Bauer, for two months sometime in the "summer" of 1993, according to Dorothy Bauer, a time frame which would coalesce with the period of April and May 1993, when Sheriff Fowler received no reports from Norma Helmig that she was being abused by Ted Helmig.

The habeas court reviewed the deposition of Darla Toebben Voss, the witness the States late endorsed, but never called to testify, who had been alleged to have first-hand knowledge of an incident involving Dale Helmig throwing coffee in his mother's face at the Country Kitchen on the Sunday before her murder. Ms. Voss testified that although she worked at the Country Kitchen in 1990, she did not work at the Country Kitchen in 1993. Darla Voss said she does not know Carol McKinney (the waitress who testified at Dale Helmig's trial that Ms. Voss told her that Dale Helmig threw coffee in his mother's face). Darla Voss said that she has never had a conversation with Sheriff Fowler, with any prosecutor, or with anyone else about coffee being thrown by Dale Helmig at Norma Helmig. Ms. Voss testified she did not know Norma Helmig.

The transcript from the preliminary hearing conducted in Dale Helmig's case was presented to the habeas court. Mr. Lilleston testified at the preliminary hearing that when he left the Travelier Motel at 5:00 a.m. on Thursday, July 29, 1993, it was pitch dark, that the entire parking lot was full, and that he didn't remember seeing any specific cars.

Trooper Westfall testified that although he testified during Dale Helmig's trial that Dale Helmig never denied killing his mother, this testimony was not truthful, as Dale Helmig had, in fact, denied killing his mother immediately after he was arrested.

Numerous other witnesses testified during the habeas corpus proceedings: (i) about Dale Helmig's whereabouts during the evening of July 28, 1993, and during the day on July 29, 1993; (ii) that Dale Helmig was in a good mood on these dates and excited at the prospect of seeing his children; (iii) about Dale Helmig's loving relationship with his mother; (iv) that Dale Helmig did not participate in the search for Norma Helmig on Saturday, July 31, 1993, because he had custody of his children, and because it had been suggested by Deputy Backus that he not have the children around the search efforts; (v) about when the subject that Norma Helmig might be found in her nightgown was first raised and by whom; (vi) about Dale Helmig's belief that his father may have killed his mother; (vi) about whether Norma Helmig actually wore her keys on her belt or carried them in her purse; and (vii) about the allegedly impaired condition of Christopher Jordan, Dale Helmig's trial counsel, during trial.[22]

The parties stipulated that the habeas court could consider the transcript of the testimony taken in the federal habeas corpus proceeding before the Federal District Court, Eastern District of Missouri, relating to the map that was not in evidence but that was provided to the jury during its deliberations. The habeas court made it clear it would not consider any testimony from that transcript about actual discussions which occurred in the jury room, though it would consider the fact that the map had gone into the jury room. The

---

**22.** This testimony cumulated to poke holes into the State's circumstantial case, and was relevant to the habeas court's conclusions that Dale Helmig established the gateway of innocence by a preponderance of the evidence and a freestanding claim of innocence by clear and convincing evidence. Under either basis for habeas review, once reliable "new evidence" of innocence is established, then *all* evidence now available, old or new, admitted or not, must be assessed by the habeas court. *See Schlup*, 513 U.S. at 327–28, 115 S.Ct. 851; *Amrine*, 102 S.W.3d at 548. Because, as we later discuss, we are not required to address either the gateway of innocence or the freestanding claim of innocence to uphold the issuance of the writ of habeas corpus, it is unnecessary for us to further amplify on this evidence.

habeas court noted that the parties had no disagreement that, in fact, "the map did go in [to the jury room] without being introduced into evidence."

### Analysis—The State's Arguments

In its Petition for Writ of Certiorari, the State raises two arguments. First, the State argues that Dale Helmig's habeas claims "are procedurally barred from review as a result of his failure to litigate the claims either at trial, on direct appeal, or in a post-conviction proceeding under Rule 29.15." Second, the State argues that Dale Helmig's "claims would not warrant a new trial if they had been brought on direct appeal or in a post-conviction proceeding" and, therefore, that "there is an insufficient basis to grant the writ of habeas corpus."

After this court issued the writ of certiorari, it sought briefing from the parties. The State's Brief asserts four Points Relied On. Though framed differently, the Points Relied On essentially overlap with the two arguments raised by the State in its Petition for Writ of Certiorari. As a result, our analysis is organized to respond to the two arguments raised by the State in its Petition for Writ of Certiorari.

### State's First Argument: Dale Helmig's habeas Claims are procedurally barred from review as a result of his failure to litigate the Claims either at trial, on direct appeal, or in a post-conviction proceeding under Rule 29.15.

The State first argues that the habeas court lacked authority to consider Claims 3, 5, 6, and 7 because they were procedurally defaulted. As framed, this argument does not address the merits of the habeas court's findings but contends that a habeas court simply has no authority to entertain constitutional infirmities affecting a defendant's trial if the claims could have been raised at trial, on direct appeal, or in a post-conviction proceeding. The State's argument is erroneous.

"Habeas corpus is not a substitute for either a failure to object to trial court error or a procedural default of a post-conviction remedy." *Sprick*, 59 S.W.3d at 519. "*Habeas corpus* exists solely to challenge the legality of confinement or custody, not to correct procedural defaults as to post-conviction remedies." *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 213 (Mo. banc 2001). It is thus said that "[p]ost conviction remedies are designed to provide a 'single, unitary, post-conviction remedy, to be used in place of other remedies,' including the writ of habeas corpus." *Id.* at 214 (quoting *Wiglesworth v. Wyrick*, 531 S.W.2d 713, 715–16 (Mo. banc 1976)). Thus, the general rule is that if a defendant fails to raise "claims in post-conviction proceedings, the defendant waives them and cannot raise them in a subsequent petition for *habeas corpus*." *Id.* (citing *Smith v. State*, 887 S.W.2d 601, 602–03 (Mo. banc 1994)).

There are limited exceptions to this rule. Two exceptions are described in *Clay v. Dormire*, 37 S.W.3d 214 (Mo. banc 2000). *Clay* acknowledged that procedurally defaulted claims can nonetheless be raised in a habeas corpus petition " 'to raise jurisdictional issues or in circumstances so rare and exceptional that a manifest injustice results.' " 37 S.W.3d at 217 (quoting *Simmons*, 866 S.W.2d at 446). Noting that the court in "*Simmons* did not define the term 'manifest injustice' for habeas cases," *Clay* held "it is essentially the same ... as the term 'miscarriage of justice' or 'fundamental miscarriage of justice' used in federal habeas cases." *Id. Clay* then held:

Following the lead of the United States Supreme Court's habeas corpus cases, and most recently *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130

L.Ed.2d 808 (1995) (full citation omitted), this Court holds that the manifest injustice or miscarriage of justice standard requires the habeas corpus petitioner "to show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent,'" *id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)) (full citation omitted), and further, "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light [of new evidence of innocence]." *Id.* As explained in *Schlup* and earlier cases, the actual innocence component of the miscarriage of justice standard is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits, [and] ... [w]ithout any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice...." *Id.* at 315–16, 115 S.Ct. 851 (quoting *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)) (full citation omitted).

*Id.* Thus, following *Clay*, our courts have permitted review of procedurally barred claims in habeas proceedings if the claim alleged that a trial court exceeded its jurisdiction ("authority" after *Webb*) or if the claim alleged manifest injustice because of new evidence establishing by a preponderance of the evidence that a reasonable juror would not have convicted the defendant.[23]

In *Jaynes*, the Missouri Supreme Court recognized a third exception (in addition to jurisdictional claims and claims of "manifest injustice") permitting procedurally barred claims to be reviewed in a habeas proceeding. 63 S.W.3d at 215. Our Supreme Court noted that *Schlup* recognized "cause and prejudice" as a basis for overcoming procedural default in a state habeas proceeding. *Id.* (citing *Schlup*, 513 U.S. at 315, 332–34, 115 S.Ct. 851). "The United States Supreme Court explained that the 'cause' of procedural default 'must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Id.* (quoting *Murray*, 477 U.S. at 488, 106 S.Ct. 2639). "To establish the 'prejudice' necessary to overcome procedural default, a petitioner ... bears the burden of showing, not merely that errors at his trial created the possibility of prejudice, but that they 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* at 215–16 (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).

 The cumulative effect of *Simmons*, *Clay*, and *Jaynes* is to permit review of procedurally barred claims in a habeas proceeding if: (1) the claim relates to a jurisdictional (authority) issue; or (2) the petitioner establishes manifest injustice because newly discovered evidence makes it is more likely than not that no reasonable juror would have convicted the petitioner (a "gateway of innocence" claim); or (3) the petitioner establishes the

**23.** Though this language is used to describe the standard which must be met to establish the "gateway of actual innocence," if the gateway of actual innocence is established, a habeas court has not determined guilt or innocence at all. *House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The gateway of actual innocence represents nothing more than a procedural passage permitting review of defaulted claims of constitutional error, and should not be trumpeted as a "declaration of innocence."

presence of an objective factor external to the defense, which impeded the petitioner's ability to comply with the procedural rules for review of claims, and which has worked to the petitioner's actual and substantive disadvantage infecting his entire trial with error of constitutional dimensions (a "gateway cause and prejudice" claim). Thus "[a] showing either of cause and prejudice or of actual innocence acts as a 'gateway' that entitles the prisoner to review on the merits of the prisoner's otherwise defaulted constitutional claims." *Amrine*, 102 S.W.3d at 546.

▮▮▮▮▮ There is, therefore, a procedural path which can permit a habeas court to consider procedurally defaulted constitutional claims. If a habeas record establishes a showing of the gateway of cause and prejudice, then the habeas court is entitled to review the merits of constitutional claims associated with that showing. If a habeas record establishes a showing of the gateway of innocence, then the habeas court is entitled to review the merits of all procedurally defaulted claims of constitutional infirmity. It is evident, therefore, that the habeas court had the authority, in the general sense, to review Dale Helmig's procedurally defaulted Claims, assuming a gateway permitting review was established. Thus, the State's first argument, which asserted that the habeas court possessed *no* authority to review Dale Helmig's procedurally defaulted Claims, is without merit.[24]

We turn, therefore, to the State's second argument.

***State's Second Argument: Dale Helmig's Claims would not warrant a new trial if they had been brought on direct appeal or in a post-conviction proceeding, and there is an insufficient basis, therefore, to grant the writ of habeas corpus.***

The State next argues that the "merits of [Dale Helmig's] claims do not warrant a new trial .... there was insufficient basis to grant the writ of habeas corpus." As previously noted, our standard of review does not permit us to review the habeas court's findings of fact. *Sprick*, 59 S.W.3d at 518. However, we do review, as a question of law, the sufficiency of the evidence to support the habeas court's conclusions. *Id.*

Claim 3(A) (the failure to disclose Norma Helmig's numerous reports of abuse and the evidence of Tina Ridenhour's report that Norma Helmig was so fearful of her husband that she armed herself with a gun) and Claim 6 (the provision of a map that was not in evidence to the jury during its deliberations) were reviewed by the habeas court employing both the gateway of cause and prejudice and the gateway of innocence.[25] The habeas court found these

---

**24.** The State's argument that a habeas court has no authority to hear procedurally barred claims is also without merit because of Dale Helmig's freestanding claim of innocence, Claim 5. The "freestanding innocence" claim recognized in *Amrine* permits habeas relief distinct from the framework evolved from *Simmons, Clay,* and *Jaynes. Amrine,* 102 S.W.3d at 547. *Amrine* held that "while the *Clay* standard is appropriate for cases involving procedurally defaulted constitutional claims, it fails to account for those rare situations, such as Amrine's, in which a petitioner sets forth a compelling case of actual innocence independent of any constitutional violation at trial." *Id.* A petitioner who can estab-

lish a freestanding innocence claim by clear and convincing evidence is thus entitled to habeas corpus relief *even if he had a fair trial. Id.* at 543. Thus, a freestanding innocence claim is unrelated to, and does not require, a claim of constitutional infirmities at trial. *Id.* As discussed in footnote 8, a fair reading of *Amrine* suggests, however, that the freestanding claim of innocence may only be available in cases where the death penalty has been imposed. 102 S.W.3d at 543.

**25.** As previously noted, the gateway of cause and prejudice was raised in Dale Helmig's Petition for Writ of Habeas Corpus. During oral argument, the State agreed that Claim

Claims to be meritorious. Claims 3(B), (C), (D), and 7 were reviewed by the habeas court employing only the gateway of innocence. The habeas court found these Claims to be meritorious. Claim 5, the freestanding claim of innocence, was also found by the habeas court to be meritorious, independently supporting the issuance of the writ of habeas corpus regardless the presence of constitutional infirmities at trial (i.e. regardless the merit of Claims 3, 6, or 7).

As we have observed, it is unnecessary for us to find that *every* alleged avenue permitting habeas review and that *every* alleged Claim, has merit in order to uphold the writ of habeas corpus. We will begin our analysis, therefore, discussing whether the gateway of cause and prejudice was established as to permit the habeas court's review of Claim 3(A) and Claim 6, and if so, whether the habeas court correctly concluded that these Claims are meritorious. Because we determine that that the gateway of cause and prejudice supports the issuance of the writ of habeas corpus with respect to Claims 3(A) and 6, we need not address the gateway of innocence (and thus Claims 3(B), (C), (D), or 7), or the freestanding claim of innocence (Claim 5).

### (A) The Gateway of Cause and Prejudice

■ Rules 29.15 and 24.035 "compel a defendant to raise claims [that the defendant is being held in detention in violation of the constitution or laws of the state or federal government] that, before the enactment of these post-conviction rules, might have been raised in a petition for *habeas corpus* relief." *Jaynes*, 63 S.W.3d at 214. "If the defendant fails to raise such claims in post-conviction proceedings, the defen-

dant waives them and cannot raise them in a subsequent petition for *habeas corpus*." *Id.* "A defendant who fails to raise such claims in post-conviction proceedings is said to have procedurally defaulted on those claims." *Id.*

■ As discussed, *supra*, one of the narrow circumstances permitting habeas review of procedurally defaulted claims is the procedural gateway of cause and prejudice, recognized in *Jaynes*, 63 S.W.3d at 215. The "cause" component of the gateway of cause and prejudice refers to the "cause" for the defendant's procedural default. That cause " 'must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.' " *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). "[A] showing that the **factual or legal basis** for a claim was not reasonably available to counsel, . . . would constitute cause under this standard." *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (emphasis added); *see also, Murray*, 477 U.S. at 488, 106 S.Ct. 2639. Thus, the procedural default must have been caused by "something that cannot fairly be attributed to the defendant." *Coleman*, 501 U.S. at 753, 111 S.Ct. 2546. If "cause" is established, "prejudice" must also be demonstrated.

To establish the "prejudice" necessary to overcome procedural default, a petitioner seeking to vacate, set aside, or correct a conviction or sentence . . . bears the burden of showing, not merely that errors at his trial created possibility of prejudice, but that they "worked to his actual and substantial disadvantage,

3(A) (which asserts two *Brady* violations) and Claim 6 (the map provided to the jury) were reviewed by the habeas court pursuant to

both the gateway of cause and prejudice and the gateway of innocence.

infecting his entire trial with error of constitutional dimensions."

*Jaynes,* 63 S.W.3d at 215–16; (quoting *United States v. Frady,* 456 U.S. at 178, 102 S.Ct. 1584). It is evident, therefore, that the gateway of cause and prejudice is claim specific, and operates to relieve the bar of procedural default only as to claimed constitutional infirmities for which cause and prejudice have been established.

Therefore, to determine whether cause and prejudice were established by Dale Helmig, we must examine the specific Claims for which that gateway is asserted—Claims 3(A) and 6.

### (i) Claim 3(A)

 Dale Helmig alleges that the State failed to disclose Norma Helmig's reports of abuse to Sheriff Fowler and Tina Ridenhour's report of Norma Helmig's fear of someone other than her son sufficient to cause her to arm herself with a handgun. With respect to both assertions, Dale Helmig contends that the nondisclosures constituted *Brady* violations. *Brady* holds that " 'the suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Merriweather v. State,* 294 S.W.3d 52, 54 (Mo. banc 2009) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. 1194).

### (a) Cause

 With respect to Norma Helmig's reports of abuse to Sheriff Fowler, the habeas court made the following factual finding:

> Sheriff Carl Fowler had actual knowledge of evidence that [Norma Helmig] had contacted authorities for protection from her abusive husband which Sheriff

Fowler neither documented nor disclosed.

We are not permitted to disturb this factual finding. *Sprick,* 59 S.W.3d at 518. We do observe, however, that the finding is supported by substantial evidence based upon our review of the habeas record.

In Dale Helmig's Rule 29.15 hearing, Sheriff Fowler admitted that Norma Helmig had come to him within the months preceding her death to report that she was being abused by Ted Helmig, and that she expressed concern about her safety. Sheriff Fowler admitted he made no written reports of any kind about Norma Helmig's allegations of abuse, that he never questioned Ted Helmig about the allegations, and that he conducted no follow-up investigation regarding the allegations, even after Norma Helmig's murder.

In the habeas corpus proceeding, Sheriff Fowler admitted he had up to fifteen contacts with Norma Helmig between the time divorce proceedings were initiated and her death relating to her fear of Ted Helmig and allegations of abuse. Sheriff Fowler did not prepare any written reports to evidence these allegations and complaints. It follows that reports never prepared could not have been provided to Dale Helmig in advance of his trial. Moreover, there is absolutely no indication in the record that Sheriff Fowler ever volunteered his knowledge to Dale Helmig. In fact, Sheriff Fowler testified at trial that neither he nor his deputies had ever been called out to investigate a report of domestic abuse involving Ted and Norma Helmig.

With respect to Tina Ridenhour's report, the habeas court expressly found that Tina Ridenhour was a credible witness. The credibility of a witness is a factual finding. *Sprick,* 59 S.W.3d at 518. The habeas court also made the following factual finding:

The prosecution located the Ridenhours through [Norma Helmig's]'s phone records. During their brief stay with [Norma Helmig], they used the phone to call Paul Ridenhour's father, Don Ridenhour, to tell him they were safe.... Don Ridenhour gave his son's telephone number to Mr. Schollmeyer, who called Mr. and Mrs. Ridenhour and interviewed them about this incident. *However, no disclosure of the Ridenhours was made to the defense .... [Dale Helmig] discovered the existence of the Ridenhours only by happenstance, subsequent to the time allowed for amending [Dale Helmig's] Rule 29.15 motion* .... Although [Dale Helmig] produced this evidence in his Rule 29.15 motion in support of a claim under *Brady v. Maryland,* the Court of Appeals denied his claim because it was not included in his amended Rule 29.15 motion.

(Emphasis added.) Again, we are not permitted to review or disturb these factual findings. *Sprick,* 59 S.W.3d at 518. We do observe, however, that the factual findings are based upon substantial evidence given our review of the habeas record.

The habeas court then found, as a matter of law, that the failure to disclose the Ridenhours' existence, and the failure to document or disclose Norma Helmig's request for protection, *"constitute cause* for raising these issues in a petition for writ of habeas corpus." (Emphasis added.) The habeas court cited to *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988) for the proposition that a failure to disclose evidence material to the defense can *satisfy the cause and prejudice test* to excuse a defendant's failure to raise a claim in an earlier proceeding.

We do not believe the habeas court exceeded its authority or abused its discretion in reaching this conclusion. First, the

habeas court's findings support the legal conclusion that Dale Helmig's claim of a *Brady* violation relating to the existence of Tina Ridenhour was not reasonably available to him at the time he filed his Rule 29.15 motion. Thus, Dale Helmig was prevented from complying with the procedural rules established for post-conviction relief due to an "objective factor external to the defense." *Murray,* 477 U.S. at 488, 106 S.Ct. 2639.

Second, the habeas court's findings support the legal conclusion that Dale Helmig's claim of a *Brady* violation relating to Norma Helmig's numerous reports of abuse was not reasonably available to him at the time he filed his Rule 29.15 motion. This conclusion requires a bit of an explanation.

The habeas court noted that Sheriff Fowler testified in the Rule 29.15 hearing about Norma Helmig's reports of abuse, rendering it self-evident that the fact of the undisclosed reports was known to Dale Helmig at the time of the Rule 29.15 hearing. Sheriff Fowler's testimony was presented in the Rule 29.15 hearing, however, in connection with a claim of ineffective assistance of counsel which asserted that trial counsel failed to discover and/or admit all evidence of Ted Helmig's motive and opportunity to murder Norma Helmig. Dale Helmig did not raise a *Brady* violation associated with Sheriff Fowler's failure to disclose the reports of abuse on direct appeal or in his Rule 29.15 proceeding. We do not believe this to be fatal, however, to Dale Helmig's ability to establish "cause" in connection with the gateway of cause and prejudice in this habeas proceeding, because the *legal* basis to *effectively* raise the *Brady* violation was not available to Dale Helmig at the time of his Rule 29.15 motion.

█ The Eastern District concluded that Dale Helmig's Rule 29.15 claims

(which revolved around his trial counsel's purported failure to discover and/or admit *all* evidence tending to suggest that Ted Helmig had motive and an opportunity to murder Norma Helmig) were without merit. *Helmig*, 42 S.W.3d at 671. The Eastern District reached this conclusion because "[e]vidence which has no other effect than to cast bare suspicion on another is not admissible." *Id.* " 'Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried *is not admissible without proof that such other person committed some act directly connecting him with the crime.*' " *State v. Chaney*, 967 S.W.2d 47, 55 (Mo. banc 1998) (quoting *State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991)) (emphasis added). The Eastern District's determination was correct. It was based, however, on the information available to the parties at the time, and thus did not take into consideration the significance of cancelled check number 1251.

During the habeas corpus proceedings, Sheriff Fowler testified that his theory at the time of trial was that whoever killed Norma Helmig threw her purse in the river. At trial, the State emphasized the discovery of Norma Helmig's purse and its contents as evidence of Dale Helmig's guilt. In its closing argument, the State theorized that Dale Helmig threw the purse into the river after killing his mother and while returning to Fulton. At trial, there was only passing mention of the fact that cancelled checks and other papers were located with the purse. Few of the cancelled checks were admitted into evidence.

During the habeas proceedings, both Sheriff Fowler and Deputy Backus testified that they never investigated the travels of cancelled check number 1251 through the banking system. The discovery long after Dale Helmig's conviction that check number 1251 cleared Norma Helmig's bank *after* her death, and would have been included in a bank statement mailed to Norma Helmig *after* her death, was found by the habeas court to "completely disrupt[ ] the state's theory about the purse." [26]

During the habeas proceedings, Ted Helmig admitted that he had been retrieving Norma Helmig's mail from a post office box following her death, had opened her bank statement, and had looked at her cancelled checks. As a result, Ted Helmig *became connected to a key piece of evidence in the crime—the purse where the cancelled checks were found.*

The State argues that Ted Helmig's initial possession of some of the cancelled checks and their later discovery with the purse only shows an attempt to cover up

---

**26.** No evidence was submitted to explain why Dale Helmig did not make this discovery by the time of trial, or in advance of his Rule 29.15 proceedings. However, we cannot fault Dale Helmig for failing to earlier appreciate the significance of cancelled check number 1251. The State did not investigate the significance of the cancelled checks. Moreover, the bank statement which would have accompanied the cancelled checks, and which would clearly have been dated *after* Norma Helmig's death, was not found with the purse, was not admitted as an exhibit at trial, and apparently can no longer be located or reproduced in its original form. We must assume that the State also failed to appreciate the significance of cancelled check number 1251 at the time of trial. This appears to be a situation where, notwithstanding the technical availability of cancelled check number 1251, no party appreciated that the check's travels defeated the theory of the State's case as to "when" the purse was thrown into the river. Under these circumstances, we conclude that the significance of check number 1251 was not " 'known to [Dale Helmig]' during his direct appeal or post-conviction case." *Engel*, 304 S.W.3d at 126 (quoting *Simmons*, 866 S.W.2d at 446).

Dale Helmig's crime. That may be true. However, the fact that there may be other explanations for the discovery of the cancelled checks with the purse besides an inference that Ted Helmig threw the purse and the cancelled checks in the river sometime following his murder of Norma Helmig does not relieve us of the obligation to acknowledge that Ted Helmig has now been connected to the purse—material evidence in Norma Helmig's murder case.[27]

The connection of the purse to Ted Helmig opens the door to the admissibility of *all* evidence suggesting that Ted Helmig had the motive and opportunity to kill Norma Helmig.[28] In contrast, assertion of a *Brady* claim during the Rule 29.15 proceeding relating to the undisclosed reports of abuse by Norma Helmig to Sheriff Fowler would have been an exercise in futility. At that time, the undisclosed evidence would have been properly determined to be inadmissible, requiring the conclusion that the nondisclosure was not prejudicial.

Those are no longer our circumstances. As a result, we have no difficulty concluding that Dale Helmig's *Brady* claim involving the nondisclosure of Norma Helmig's numerous reports of abuse was not available to him at trial or in his Rule 29.15 proceeding, and that Dale Helmig has established a cause external to his defense which prevented him from raising the

claim any earlier. *Coleman*, 501 U.S. at 753, 111 S.Ct. 2546 ("[A] showing that the *factual or legal basis* for a claim was not reasonably available to counsel, ... would constitute cause ....") (emphasis added). We are not barred, therefore, from considering Dale Helmig's *Brady* claim relating to the undisclosed evidence of Norma Helmig's numerous reports of abuse to Sheriff Fowler, even though the fact of nondisclosure was known to Dale Helmig before his Rule 29.15 hearing. *See Engel*, 304 S.W.3d at 126–30 (holding that even though defendant unsuccessfully raised the State's failure to disclose certain exculpatory impeachment evidence in previous habeas proceedings, the Supreme Court could nonetheless hear the same *Brady* claim in a new habeas proceeding, and could review the same undisclosed evidence, in light of the discovery of additional undisclosed evidence, all of which accumulated to demonstrate cause and prejudice warranting habeas corpus relief).

We conclude that Dale Helmig established "cause" in connection with Claim 3(A), both with respect to the undisclosed existence of Tina Ridenhour and her report, and with respect to the undisclosed reports of abuse by Norma Helmig to Sheriff Fowler.

### (b) Prejudice

 The habeas court concluded as a matter of law that Dale Helmig was

---

27. Of course, there may be other explanations for the cancelled checks finding their way into the purse besides Ted Helmig putting them there. For example, the habeas court heard evidence that the cancelled checks were taken by Ted Helmig to Norma Helmig's house, as he returned to live in the house after Norma's murder. Dale Helmig, therefore, also had access to the cancelled checks. We are not required to conclude, however, that Ted Helmig put the cancelled checks into the purse or that Ted Helmig threw the purse into the river, to conclude that Ted Helmig's admitted possession of the cancelled checks connects him to the crime in a manner sufficient to now permit the admission of evidence suggesting that he also had a motive and an opportunity to murder Norma Helmig.

28. We draw no conclusion about Ted Helmig's involvement in Norma Helmig's death. However, it is a rudimentary observation that the circumstantial evidence that formed pieces of the puzzle relied on by the State to convict Dale Helmig is matched, if not exceeded, by the circumstantial evidence that could have formed pieces of a puzzle to charge, and possibly convict, Ted Helmig.

prejudiced by the nondisclosure of Norma Helmig's reports of abuse to Sheriff Fowler and the State's nondisclosure of the existence of Tina Ridenhour. We cannot conclude that the habeas court exceeded its authority or abused its discretion in reaching this conclusion.

> In the context of whether [a defendant's] *Brady* claims are barred procedurally from habeas review, prejudice is identical to this Court's assessment of prejudice undertaken in assessing [a defendant's] *Brady* claims. Consequently, so long as [a defendant] established the prejudice to support his *Brady* claims, he will have shown the required prejudice to overcome the procedural bar for habeas relief.

*Engel*, 304 S.W.3d at 126.

██ To prevail on a *Brady* claim, Dale Helmig "must show each of the following: (1) the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) he was prejudiced." *Engel*, 304 S.W.3d at 126.

Dale Helmig has satisfied the first prong for his *Brady* claim. Evidence that Norma Helmig was fearful of someone other than Dale Helmig and that Ted Helmig had, in fact, engaged in behavior of a threatening nature with Norma Helmig suggested a viable suspect other than Dale Helmig in his mother's death. At a minimum, Dale Helmig could have used the undisclosed information to "underscore[ ] the possibility that [Ted] was [Norma's] killer through cross-examination of the police on their failure to direct any investigation against [Ted]." *Kyles v. Whitley*, 514 U.S. 419, 442 n. 13, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Dale Helmig could have used such information "to attack ... the thoroughness and even the good faith of the investigation...." *Id.* at 445, 115 S.Ct. 1555.

The undisclosed evidence is favorable to Dale Helmig.

██ Dale Helmig has satisfied the second prong for his *Brady* claim. As we have already discussed, the habeas court found that the State suppressed the subject evidence. It is true that there is no evidence that the Prosecutor had direct knowledge of the numerous complaints and allegations of abuse made by Norma Helmig to Sheriff Fowler. However, "*Brady* provides that 'the individual prosecutor has a duty to learn of any favorable evidence known to *the others acting on the government's behalf* in the case, including the police.'" *Engel*, 304 S.W.3d at 127 (citing *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555). Thus:

> [I]t is no hindrance to [Dale Helmig's] *Brady* claim that the prosecutor did not have the same knowledge about his case as [Sheriff Fowler]. The prosecutor's lack of knowledge about information asserted in a *Brady* claim is not an impediment because the prosecutor is considered "'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'"

*Id.* at 127–28 (footnote omitted) (quoting *Strickler*, 527 U.S. at 281, 119 S.Ct. 1936).

Dale Helmig has satisfied the third prong for his *Brady* claim—prejudice. To determine "whether evidence meets the test for *Brady* prejudice, this Court must assess whether the evidence at issue is material to [Dale Helmig's] case." *Engel*, 304 S.W.3d at 128.

> The materiality standard for *Brady* claims is established when "the favorable evidence could reasonably be taken

to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555.

*Engel*, 304 S.W.3d at 128.

Sheriff Fowler testified at trial that *no* reports of domestic violence had ever been received by Sheriff Fowler or his Department regarding Ted and Norma Helmig. This testimony is contravened by his later acknowledgement that he received several reports from Norma Helmig alleging abuse severe enough to cause her to inquire into possessing a firearm. At worst, Sheriff Fowler's trial testimony was patently false, if not perjury. At best, it was seriously misleading. In either case, Sheriff Fowler's testimony underscores the materiality of the evidence relating to Ted Helmig's alleged abusive treatment of Norma Helmig. The evidence Sheriff Fowler did not reveal to Dale Helmig could have been an effective rebuttal to Sheriff Fowler's contrary testimony and to the State's efforts at trial to minimize any suggestion that Ted Helmig was an alternative suspect.

Dorothy Bauer testified at trial that Norma Helmig was nervous and upset a lot in the months before her death in a manner which suggested the behavior was attributable to a fear of Dale Helmig. As the habeas court noted, "the evidence not revealed by Sheriff Fowler would have been an effective rebuttal to the State's allegation that Norma Helmig feared her son rather than her estranged husband."

For the same reasons discussed, we conclude the existence of Tina Ridenhour and of her reported encounter with Norma Helmig was favorable to Dale Helmig and material to Dale Helmig's defense such that its nondisclosure was prejudicial under *Brady*. Certainly, the undisclosed Tina Ridenhour report accumulates with the undisclosed reports of abuse made by Norma Helmig to suggest that a strong case could have been made that Norma Helmig's fearfulness before her death was a result of her fear of Ted Helmig and not of Dale Helmig. *Kyles*, 514 U.S. at 436–37, 115 S.Ct. 1555 (discussing that courts must consider the cumulative effect of excluded evidence in determining if a *Brady* violation occurred). Absent the disclosure of the evidence pointing to the motive of Ted Helmig, Dale Helmig was deprived of the opportunity to point the jury toward another suspect, particularly given Ted Helmig's connection to evidence in Norma Helmig's murder. *Chaney*, 967 S.W.2d at 55.

Moreover, as discussed, *supra*, Dale Helmig was prejudiced because *all* evidence suggesting that Ted Helmig had a motive and an opportunity to murder Norma Helmig became admissible in light of Ted Helmig's connection to the cancelled checks—an admission which "connected" Ted Helmig to evidence in Norma Helmig's murder—the purse. The evidence on this subject includes, but is not limited to: the numerous accounts of Ted Helmig's abusive relationship with Norma Helmig; Norma Helmig's palpable fear of Ted Helmig; Norma Helmig's desire to carry a firearm to protect herself from Ted Helmig; Ted Helmig's lack of an alibi during the timeframe of Norma's murder; Ted Helmig's experience with electricity in the military given that the "window" of time within which Norma Helmig was murdered occurred when the power in her area was inexplicably interrupted; Ted Helmig's gratuitous statements to Sheriff

Fowler that he and Norma Helmig had continued to have sexual relations in her bed as recently as a day or two before she disappeared; that Ted Helmig saw Norma Helmig with another man in the bar at the American Legion Hall on Wednesday, July 28, 1993, within hours of Norma Helmig's death; that Ted Helmig (not Dale Helmig) had been involved in an altercation with Norma Helmig at the Country Kitchen where he threw coffee in her face not long before her death and at a time where it can be inferred from the evidence that she may have been with another man; that Ted Helmig, in the weeks following Dale Helmig's conviction and while under the influence of alcohol, made incriminating statements suggesting he was sorry for what had happened and that he had not meant to hurt "her"; and that Ted Helmig stood to gain financially from, and did gain financially from, Norma Helmig's death.[29] As noted in *House v. Bell,* 547 U.S. 518, 540, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), when the identity of a killer is in question, "motive is key."

We conclude that the habeas court did not exceed its authority or abuse its discretion, therefore, when it found that the undisclosed contacts between Norma Helmig and Sheriff Fowler, and the undisclosed existence of Tina Ridenhour, were material to Dale Helmig's defense within the meaning of *Brady.* Due process required the prosecution to disclose Norma Helmig's numerous reports of abuse and the existence of Tina Ridenhour to Dale Helmig as the evidence "is favorable to him and ... material to his guilt." *Engel,* 304 S.W.3d at 127.

We conclude that the habeas court did not exceed its authority or abuse its dis-

cretion in concluding that Dale Helmig established a gateway of cause and prejudice permitting review of Claim 3(A), and that the habeas court did not exceed its authority or abuse its discretion by concluding that Claim 3(A) is meritorious.

### *(ii) Claim 6*

 Dale Helmig alleges that that his constitutional rights were violated because a map of uncertain nature and description, which was not admitted into evidence, was provided to the jury during deliberations. "Jury exposure to facts not in evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment." *Lawson v. Borg,* 60 F.3d 608, 612 (9th Cir.1995). "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Helmig,* 2005 WL 2346954, at *36–7 (quoting *Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965)).

As previously noted, this same claim was successfully asserted by Dale Helmig in the federal habeas corpus proceeding filed in the United States District Court, Eastern District of Missouri, though the district court's writ of habeas corpus was thereafter quashed by the Eighth Circuit. *Helmig v. Kemna,* 461 F.3d 960, 963 (8th Cir.2006). Judge McElwain concluded, however, that because the Eighth Circuit's decision was based on procedural requirements and limitations that do not exist under Missouri law, "the decision of the Eighth Circuit Court of Appeals does not preclude habeas corpus review in a Mis-

---

**29.** Though some of this evidence was introduced during Dale Helmig's trial, not all of it was. As the State argues in its briefs before this Court, this evidence would not have been admissible at Dale Helmig's first trial under the authority of *Chaney,* just as was found by the Eastern District in Dale Helmig's appeal from the denial of his Rule 29.15 motion.

souri Court." *See, e.g., Shelton v. City of Springfield*, 130 S.W.3d 30, 36 (Mo.App. S.D.2004).[30]

### (a) Cause

■■■ The habeas court noted in the writ of habeas corpus that:

> the parties stipulated that this Court accept the record of the testimony of proceedings in *Helmig v. Kemna*, No. 4:02–CV–574 DDN, 2005 WL 2346954 (E.D.Mo. Sept.20, 2005), filed as Exhibit 57, as the facts supporting [Dale Helmig's] claim that his right to a fair trial was violated by the jury's consideration of a map which was not in evidence, but which nevertheless was provided to them during deliberations.

The State does not dispute that it entered into this stipulation.

The record of the testimony of the hearing in *Helmig v. Kemna* unquestionably supports the conclusion that the jury knocked on the jury room door during deliberations and requested a map from an unidentified third person. A map was provided to the jury by an unidentified third person. No map was introduced into evidence at trial. Thus, whatever map was provided to the jury, it was not a trial exhibit. The trial judge was not aware that the jury had requested a map or that a map had been provided to the jury.

The habeas court made the factual finding that Dale Helmig learned that a map had been provided to the jury "after the Missouri Court of Appeals affirmed the denial of [Dale Helmig's] Rule 29.15 mo-

tion." The habeas court also found that "[Dale Helmig's] counsel came upon this knowledge by happenstance, while investigating other unrelated issues." We are not permitted to disturb these factual findings. *Sprick*, 59 S.W.3d at 518. We do observe, however, that the findings are supported by the stipulated evidence drawn from the federal habeas corpus proceeding.

The habeas court thus found that Dale Helmig established "cause" pursuant to the gateway of cause and prejudice excusing his failure to raise a claim relating to the map in his Rule 29.15 motion. Though Dale Helmig did not know about the delivery of the map to the jury as to permit his timely assertion of Claim 6 in his Rule 29.15 motion, the State nonetheless argues that Dale Helmig has not established "cause" for the gateway of cause and prejudice because he has not established that he could not have learned of the information sooner. We are not persuaded by this argument. Nothing in this record suggests that Dale Helmig was earlier alerted or should have been earlier alerted to the prospect of discovering that the jury had been provided a map that was never introduced into evidence during its deliberations.

We conclude that Dale Helmig has established facts and circumstances external to his defense which prevented him from complying with the State's procedural rules regarding timely assertion of Claim 6 in his Rule 29.15 motion. We conclude, therefore, that the habeas record supports a finding of "cause" as a part of the gate-

---

**30.** Rule 91.22 provides that "[w]hen a petition for a writ of habeas corpus has been denied by a higher court, a lower court shall not issue the writ unless the order in the higher court denying the writ is without prejudice to proceeding in a lower court." We believe the reference in Rule 91.22 to "higher court" means a higher state court, and not a federal court. Even if "higher court" can be construed to include federal courts, Rule 91.22 would have no application here, as the Eighth Circuit applied different legal principals to dispose of Dale Helmig's writ of habeas corpus than those applicable in a state habeas corpus proceeding.

way of cause and prejudice with respect to Claim 6.

### (b) Prejudice

 Juror testimony cannot be offered to impeach a jury verdict. *Strong v. State,* 263 S.W.3d 636, 643 (Mo. banc 2008). However, there is a limited exception to this rule. Misconduct occurring **outside** the jury room, which would include independent investigation or communications with or coming from third persons, can be established by juror testimony. *Storey v. State,* 175 S.W.3d 116, 130 (Mo. banc 2005). The delivery of the map to the jury involved conduct occurring *outside* the jury room. Juror testimony about that conduct was, therefore, permissibly considered. *Strong,* 263 S.W.3d at 644; *State v. Rios,* 314 S.W.3d 414, 419 (Mo.App. W.D.2010).[31]

 "The delivery to the jury for their consideration of an exhibit not received in evidence constitutes error." *Osborne v. United States,* 351 F.2d 111, 115 (8th Cir.1965). "Because a jury's verdict must be based upon evidence presented at trial, it is inappropriate for a juror to view ... extraneous materials [during] the jury's deliberations, even seemingly innocuous materials such as dictionaries and maps." *Helmig v. Kemna,* 461 F.3d at 962; *see also State v. Cook,* 676 S.W.2d 915, 917 (Mo.App. E.D.1984) (holding that where jury seeks information from an outside source, MAI–CR2d 2.01, which tells the jury to determine the facts only from the evidence, is violated). Given the State's concession that a map that was not in evidence was provided to the jury at the jury's request and in the midst of its deliberations, there is no dispute that error occurred in Dale Helmig's trial.

Such error constitutes a ground for reversal if the defendant's substantive rights were prejudiced. *Osborne,* 351 F.2d at 117. The parties contest whether Dale Helmig was prejudiced by the conceded jury misconduct in this case. They also contest who bore the burden to prove (or disprove) prejudice.

 Under Missouri law, "'there is a rebuttable legal presumption that [communications with jurors] were prejudicial to the moving party.'" *State v. Babb,* 680 S.W.2d 150, 152 (Mo. banc 1984). The State has the burden to rebut this presumption by affirmatively showing that the jurors were not improperly influenced. *Storey,* 175 S.W.3d at 130; *State v. Quinn,* 405 S.W.2d 895, 896 (Mo. banc 1966). The habeas court concluded that this presumption of prejudice applied equally in Dale Helmig's habeas corpus proceeding, and thus imposed the burden on the State to affirmatively prove that Dale Helmig was not prejudiced by the improper provision of the map to the jury. The habeas court found that the State did not sustain its burden.

The State argues that the presumption of prejudice from juror misconduct is not available in a post-conviction proceeding, and only applies if the misconduct was raised during trial or on direct appeal. The State thus argues that Dale Helmig had the burden to prove he was prejudiced by the delivery of the map to the jury. The Eighth Circuit agreed, as it held that the "the district court erred in applying the presumption of prejudice without taking into account that this is a habeas case." *Helmig v. Kemna,* 461 F.3d at 963. The Eighth Circuit imposed the burden to

---

**31.** In reviewing the sufficiency of the evidence to support the habeas court's finding that Dale Helmig was prejudiced by jury misconduct, we have not considered any testimony from the proceedings before the federal district court involving juror testimony about why the map was requested or how the map was used during deliberations.

prove prejudice on Dale Helmig and found he did not sustain his burden. *Id.* at 965. The State argues that we should do the same.

▮ We are aware of no Missouri authority which stands for the proposition that where a particular constitutional violation carries with it a presumption of prejudice, that presumption is "stripped" if the constitutional violation is first raised in a state court post-conviction proceeding. It is true that a habeas corpus petitioner has the burden of proof to show that he is entitled to habeas corpus relief. *State ex rel. Koster v. Koffman,* 290 S.W.3d 126, 129 (Mo.App. W.D.2009). That general proposition, however, does not require us to conclude that a habeas corpus petitioner is deprived of a presumption of prejudice associated with a particular constitutional violation when that presumption would have been available to the petitioner had the violation been raised on direct appeal. Further, we are not persuaded by the Eighth Circuit's determination that, upon establishing juror misconduct, the burden of proving prejudice shifts back to the petitioner in a habeas proceeding. Certainly, this is not a settled issue in the federal courts. *See, e.g. Perkins v. Herbert,* 537 F.Supp.2d 481, 503 (W.D.N.Y. 2008) (holding that there is a "substantial burden of persuasion on the State" to prove harmlessness to a federal habeas court) *rev'd on other grounds Perkins v. Herbert,* 596 F.3d 161 (2nd Cir.2010). We conclude that there is no reasoned basis under Missouri law to deprive a petitioner in a habeas corpus proceeding of the benefit of a presumption of prejudice in the face of an established constitutional violation if the benefit of that presumption would have been afforded to the defendant on direct appeal. This conclusion is particularly appropriate where the gateway of cause and prejudice is relied upon to permit review of an otherwise procedurally defaulted claim.

▮ Thus, the question squarely presented is whether the State met its affirmative burden to rebut the presumption that the erroneous delivery to the jury of a map which was not in evidence was prejudicial to Dale Helmig. We conclude it did not.

The State argues that the map was not, truly, extraneous material, as the court could have taken judicial notice of the map. *See State v. Vincent,* 582 S.W.2d 723, 725 (Mo.App. E.D.1979). *Vincent,* however, involved an official state highway map. *Id.* There is no evidence that the map delivered to Dale Helmig's jury was an official state highway map. In any event, the trial court did not take judicial notice of the map delivered to the jury. The map, therefore, was not in evidence.

The State next argues that "the federal court of appeals found that petitioner suffered no prejudice because of the detailed geographical information before the jury via testimony and exhibits." The State then quotes at length from the analysis set forth in the Eighth Circuit opinion. This analysis was not binding on the habeas court. The Eighth Circuit applied a different procedural standard than that deemed applicable under state law. The Eighth Circuit imposed the burden to prove prejudice on Dale Helmig instead of imposing the burden to disprove prejudice on the State. Thus, its analysis is necessarily crafted from the perspective of the sufficiency of Dale Helmig's proof of prejudice and not from the perspective the habeas court was required to apply—the sufficiency of the State's proof that Dale Helmig was not prejudiced.

Other than its reliance on the Eighth Circuit's analysis, the State offers no evidence or argument to affirmatively prove that Dale Helmig was not prejudiced by

the concededly improper provision of a map not in evidence to the jury during deliberations.

It is true that the "relational" features of Dale Helmig's trial—that is the relative location of towns, rivers, and highways, and the distance between towns—was not the subject of contest during Dale Helmig's trial. *Helmig v. Kemna*, 461 F.3d at 965. However, the discussion of these "relational" features was sprinkled throughout the testimony of several different witnesses, and involved general testimony about the time it might take to travel between locations, or about the direction one would travel from one place to the next, or about from which bridge Norma Helmig's body and purse must have been dumped in order to end up where each was discovered.

No witness provided the jury with a comprehensive "picture" of the logistics Dale Helmig would have been required to accomplish to commit the murder of his mother as theorized by the State. In closing argument, the State theorized that Dale Helmig left Fulton, traveled across the Highway 54 Bridge (the Bridge that had earlier been closed), drove through Jefferson City and down to Pointer's Creek in Osage County, killed his mother, placed her body in the trunk of her own car, drove her car back into Jefferson City where her body was thrown from a bridge, drove his mother's car back to her house, retrieved his own car, drove back to Fulton, stopping along the way to throw his mother's purse from a bridge, all between approximately 4:00 a.m. and 6:00 a.m. on Thursday, July 29, 1993. That Dale Helmig could have accomplished these geographic logistics as argued by the State was a reasonable inference the State asked the jury to make and, indeed, was a reasonable inference the jury was required to make, in order to convict Dale Helmig.

We can conceive of no reason that the jury would have requested a map during its deliberations unless it was trying to determine, of its own accord, that Dale Helmig could have murdered his mother in the manner theorized by the State. If the jury was required to go beyond the evidence to persuade itself of the viability of the State's theory, then Dale Helmig was prejudiced, as there is a reasonable probability that the jury would have reached a different verdict without the map.

█ In fact, assuming, *arguendo*, that Dale Helmig is not entitled to the benefit of a presumption of prejudice, we would nonetheless conclude that prejudice has been demonstrated on this habeas record. The State's circumstantial case was tried with heavy reliance on a "storyline" which parsed together geographic and other temporal logistics. The map was provided to the jury *before* it rendered a unanimous verdict of guilt. The importance of the map's contents given the facts and issues involved in this particular case cannot be reasonably questioned. We are compelled to conclude, therefore, that there is a very real possibility that, but for the map, the outcome of Dale Helmig's trial might have been different.

We cannot find that the habeas court exceeded its authority or abused its discretion when it concluded that the gateway of cause and prejudice was established in connection with Claim 6, or that the habeas court exceeded its authority or abused its discretion in finding that Claim 6 was meritorious, such that Dale Helmig's Fifth, Sixth and Fourteenth Amendment rights were violated.

### (B) The Gateway of Innocence and the Freestanding Innocence Claims

We have concluded that Dale Helmig established the gateway of cause and prejudice as to Claims 3(A) and 6, and that

Dale Helmig demonstrated Claims 3(A) and 6 to be meritorious. These conclusions require us to uphold the writ of habeas corpus. Thus, we need not address whether the issuance of the writ of habeas corpus could also be upheld on the alternative ground of the gateway of innocence as to Claims 3, 6, and 7, or on the alternative ground of Claim 5, the freestanding claim of innocence.

Neither the State nor Dale Helmig is in any way impaired by our determination to address no more than that which is necessary to conclude that the habeas court's issuance of the writ of habeas corpus must be upheld. The writ of habeas corpus affects nothing more than a procedural outcome—the vacation of Dale Helmig's conviction.[32] That would be the case regardless the number, or nature, of the grounds on which the writ of habeas corpus is issued.

### Conclusion

██ "Habeas corpus is the last judicial inquiry into the validity of a criminal conviction and serves as 'a bulwark against convictions that violate fundamental fairness.'" *Amrine*, 102 S.W.3d at 545 (quoting *Engle v. Isaac*, 456 U.S. 107, 126, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)). Dale Helmig established a fundamental miscarriage of justice that justifies habeas corpus relief. *State ex rel. Simmons v. White*, 866 S.W.2d 443 (Mo. banc 1993). The writ of habeas corpus is supported by the finding of a gateway of cause and prejudice, and by the resultant findings that Claim 3(A) and Claim 6 are meritorious claims of constitutional infirmities which violated Dale Helmig's due process rights and the fundamental fairness of his trial. We refuse to quash the record of the habeas court on these grounds. We quash the record of the habeas corpus on all other grounds.

By virtue of the writ of habeas corpus, Dale Helmig's conviction for the first degree murder of his mother is vacated. Dale Helmig remains subject to retrial. The writ of habeas corpus required the retrial of Dale Helmig for the first degree murder of his mother to occur, if at all, within 180 days from the date of issuance of the writ of habeas corpus. The State has not claimed that the habeas court exceeded its authority or abused its discretion in imposing this limitation on the time available for the State to retry Dale Helmig, should it elect to do so. We question, however, the authority of a circuit court to direct the conduct or activity of another circuit court. In any case, we note that there is authority permitting an appellate court to impose restrictions on the retrial of a defendant whose conviction has been vacated by a writ of habeas corpus. *Amrine*, 102 S.W.3d at 544, 549; *Engel*, 304 S.W.3d at 130. We direct, therefore, that the State must retry Dale Helmig for the murder of Norma Helmig, if at all, within 180 days of the issuance of our mandate, or Dale Helmig shall be discharged from the State's custody.[33] The trial court may extend the time frame for retrial for good cause shown if so requested by Dale Helmig.

All concur.

---

**32.** See footnotes 2, 12, and 23.

**33.** We include within our use of the word "custody" Dale Helmig's status as a charged suspect in the murder of his mother, and the imposition of bail upon Dale Helmig's release from incarceration pursuant to Rule 91.14 following the issuance of the writ of habeas corpus.