

# In the
# Missouri Court of Appeals
## Western District

|  |  |  |
|---|---|---|
| **STATE OF MISSOURI, ex rel.** | ) | |
| **ERIC S. SCHMITT,** | ) | **WD83688** |
| | ) | |
| **Relator,** | ) | **OPINION FILED:** |
| | ) | **April 28, 2020** |
| **v.** | ) | |
| | ) | |
| **THE HONORABLE DANIEL R.** | ) | |
| **GREEN, Circuit Judge of Cole County,** | ) | |
| **and** | ) | |
| | ) | |
| **DAWNEL DAVIDSON, Circuit Clerk** | ) | |
| **of Cole County Circuit Court,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## ORIGINAL PROCEEDING IN CERTIORARI

Before Writ Division: Cynthia L. Martin, Presiding Judge, Gary D. Witt, Judge and
Edward R. Ardini, Jr., Judge

This is an original proceeding in certiorari to review the grant of a writ of habeas

corpus by the Cole County Circuit Court ("habeas court"). The writ of habeas corpus

vacated Jonathan H. Irons's ("Irons") convictions for first degree assault, armed criminal

action, and first degree burglary in *State v. Jonathan Houston Irons*, St. Charles County,

CR197-271FX. Irons, who was sixteen years old at the time of the offenses giving rise to

his convictions, was sentenced in 1998 to fifty years' imprisonment. The Attorney General for the State of Missouri ("State") filed a petition for writ of certiorari following the habeas court's grant of habeas corpus relief. We issued a writ of certiorari as a matter of right. *State ex rel. Nixon v. Kelly*, 58 S.W.3d 513, 516 (Mo. banc 2001). We ordered the Circuit Court of Cole County, Missouri to return the record. Having reviewed the returned record, we refuse to quash the record of the habeas court.

**Irons's Habeas Claims and the Habeas Court's Stated Basis for Affording Relief**

Irons filed a petition for writ of habeas corpus in the Cole County Circuit Court on December 21, 2018 pursuant to Missouri Supreme Court Rule 91. The petition raised four claims for relief: (1) that the State suppressed impeaching and exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), specifically latent fingerprint reports, and an incriminating blog containing posts attributable to Detective Michael Hanlen ("Det. Hanlen"); (2) that Irons's convictions were secured through the perjured testimony of Stanley Stotler ("Stotler") (the victim), and Detective Ricky Luetkenhaus ("Det. Luetkenhaus") who testified about latent fingerprints found at the crime scene; (3) that Irons was improperly certified to be tried as an adult; and (4) that Irons received ineffective assistance of trial counsel. The habeas court conducted an evidentiary hearing on the habeas petition on October 9, 2019.

At the end of the hearing, Irons sought leave to file an amended habeas petition because evidence uncovered during the hearing bolstered his *Brady* claim (claim 1) and his perjured testimony claim (claim 2). Leave was granted, and Irons filed a first amended habeas petition on October 22, 2019. Warden Eileen Ramey, the respondent in the habeas

2

proceeding, filed a response to the first amended habeas petition. Both pleadings attached numerous exhibits.

On March 9, 2020, the habeas court entered its order and judgment ("Judgment") finding, based on the evidence presented at the evidentiary hearing and the record in the case, that Irons had established a *Brady* violation based on an undisclosed latent fingerprint report (a portion of claim 1). The Judgment did not determine whether Det. Hanlen's incriminating blog posts had been suppressed in violation of *Brady* (the remaining portion of claim 1), or claims 2, 3, and 4 of Irons's first amended habeas petition. However, factual findings involving the undetermined claims were made by the habeas court to bolster its conclusion that the established *Brady* violation warranted habeas relief.

The Judgment entered a conditional writ of habeas corpus discharging Irons from his convictions unless the St. Charles County Prosecutor elected, within thirty (30) days, to retry Irons. The conditional discharge order was stayed by the habeas court pending the State's appeal to seek a writ of certiorari. Because the State sought and secured a writ of certiorari from this court within thirty (30) days of the Judgment, the conditional writ of habeas corpus remains stayed.

**Standard of Review**

A writ of certiorari requires the habeas court to "produce a certified record of a particular case for review for irregularities." *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 231 (Mo. App. W.D. 2011) (citation omitted). Certiorari is "available to correct judgments that are in excess or an abuse of [authority], and that are not otherwise reviewable by appeal." *State ex rel. Nixon v. Sprick*, 59 S.W.3d 515, 518 (Mo. banc 2001);

3

*see State ex rel. Koster v. Jackson*, 301 S.W.3d 586, 589 (Mo. App. W.D. 2010) (explaining that earlier cases requiring review of whether a habeas court acted in excess or in abuse of its jurisdiction must now be read as requiring review of whether a habeas court acted in excess or abuse of its authority).

Certiorari review is limited. In determining whether the habeas court exceeded or abused its authority to grant habeas relief, "we do not review findings of fact." *State ex rel. Koster v. Green*, 388 S.W.3d 603, 606 (Mo. App. W.D. 2012) (citing *Sprick*, 59 S.W.3d at 518). Instead, review is constrained to determining a question of law: whether the habeas record "support[s] the grant of a writ of habeas corpus in light of the applicable law." *Id.* (citing *Sprick*, 59 S.W.3d at 518). If the factual findings made by the habeas court support the issuance of a writ of habeas court consistent with the applicable law, then the habeas court did not exceed or abuse its authority. "Upon the completion of our review, our options are to 'either quash the writ or [to] uphold the actions of the habeas court'" by refusing to quash the writ. *Id.* (quoting *Jackson*, 301 S.W.3d at 589).

Given this standard of review, and because, as we discuss, *infra*, a *Brady* violation cannot support habeas relief as a matter of law unless the suppressed information is exculpatory and results in prejudice, we begin by summarizing the facts pertinent to Irons's underlying convictions as found by the habeas court in sections I and II of the Judgment.

**Factual Findings Pertinent to Irons's Convictions**

On January 14, 1997, Stotler returned to his home in O'Fallon, Missouri between 6:30 p.m. and 6:40 p.m. Stotler went to his room to change, and heard a "click" sound coming from his closet.

4

Stotler's home had been burglarized on December 16, 1996, so Stotler was fearful he was being burglarized again. He pulled a 9mm handgun from under his mattress, loaded and cocked the firearm, and pointed it toward the closet. Stotler ordered the intruder to come out of the closet and warned he was calling the police. Stotler held his firearm with one hand while picking up the telephone with the other.

Stotler's closet door opened, and a young African-American man was standing in the doorway. It was dark in the closet and the light was off. The intruder asked Stotler not to call the police.

Stotler kept his firearm pointed at the intruder for five to ten seconds before the intruder slowly closed the closet door. Stotler dialed 911 and yelled to the intruder to take what he wanted and to leave. The closet door reopened and Stotler saw a flash of light. Stotler realized he had been shot in the right arm. The intruder fled from the closet and shot Stotler a second time in the right temple as he left the bedroom. Stotler staggered to the kitchen and called 911 from the kitchen phone at 6:42 p.m. Stotler told the 911 dispatcher he had been shot, that he did not see what the intruder was wearing, that he did not know whether the intruder said anything to him, that he did not see the intruder leave the house, and that he believed the intruder was still in the house.

Lieutenant Douglas Casteel of the O'Fallon Police Department arrived at the scene. He noticed that the front door of the house was open. He searched the house and did not find an intruder inside. Stotler was taken to the hospital. Additional officers arrived on the scene and noted that a basement window had been broken and appeared to be the point of entry for the intruder. A plastic grocery bag was recovered outside the broken basement

5

window containing a CD player with headphones, assorted CD's, and power cords. The contents of the bag did not belong to Stotler. Two .25 caliber automatic shell casings and one 9mm shell casing were recovered from Stotler's bedroom.

Det. Luetkenhaus collected latent fingerprints from the interior of the open front storm door of Stotler's home. Besides the broken basement window, all other exit points from the home remained locked and undisturbed, leading to the conclusion that the intruder left through the open front storm door. Stotler did not provide any identifying information about the intruder other than that he was a black male. Stotler was unable to provide a description of the intruder's clothing, weight, height, or distinguishing features.

Detective John Neske ("Det. Neske") was assigned to conduct a follow-up investigation. He canvassed the neighborhood and spoke with persons who lived in Stotler's neighborhood. Information Det. Neske obtained eventually led him to secure a pick up order for Irons.

Erin Windau ("Windau"), a friend of Irons, advised that she was with Irons on January 14, 1997 at Tim Russell's ("Russell") house, and that Irons had a gun in his possession. Windau testified at trial that the gun she saw "looked like" a gun Det. Luetkenhaus obtained from a confidential informant during the investigation. The confidential informant who found the gun gave it to Det. Luetkenhaus merely because he believed it was suspicious. However, there was no established connection between the confidential informant and Irons, or between the located gun and the crime scene. The gun had no fingerprints, and the serial number had been defaced. No evidence connected the

gun to the firearm that was used to shoot Stotler. Ballistics reports did not connect the spent .25 caliber shell casings found at the crime scene to the gun.

Russell reported that he was at home in the early evening of January 14, 1997. Russell lived one street over from Stotler. Russell said that Irons came to his house sometime between 5:00 p.m. to 6:00 p.m. and stayed for about forty-five minutes. Russell said that Irons had a couple of CD's with him, but no plastic bag, and that he was wearing a "mechanical jumpsuit." Russell said that Irons had a handgun with him, and like Windau, claimed it was similar in appearance to a gun given to Det. Luetkenhaus by a confidential informant.

Scott Emberton ("Emberton") also lived in Stotler's neighborhood and knew Irons. He said that on January 14, 1997 at around 6:00 p.m., he saw Irons walking down the street carrying a plastic bag. Emberton claimed Irons was wearing a hooded sweatshirt and dark pants.

Irons was in Troy, Missouri a week after the break-in at Stotler's home. He was arrested on January 21, 1997 after a foot chase, and turned over to the O'Fallon Police Department. Irons was sixteen years old at the time of his arrest. Det. Neske interviewed Irons after he was apprehended in Troy. During this interview, Irons refused to give a statement and exercised his right to remain silent. The State admitted into evidence a written waiver of rights signed by Irons indicating his refusal to make a statement to Det. Neske.

Irons was transported from Troy, Missouri to the O'Fallon jail. Irons was then questioned by Det. Hanlen. During a subsequent pretrial suppression hearing, Det. Hanlen

7

claimed that he read Irons his *Miranda*[1] rights, and that Irons verbally acknowledged that he understood the rights. Det. Hanlen testified that Irons initially denied being at the crime scene, but then admitted to being at the crime scene, but not inside Stotler's house. Det. Hanlen said that Irons later admitted that he broke out the basement window at Stotler's house, but had no memory of what took place after that point. There were no notes, recordings, or records of Det. Hanlen's interrogation of Irons. Det. Hanlen testified during the suppression hearing that he liked to interrogate suspects in private, and without recording the interrogation. Det. Hanlen claimed to have disposed of the handwritten notes he made from his interview of Irons before anyone else saw them. Det. Hanlen claimed that Irons's "confession" was not in writing because, according to Det. Hanlen, Irons "didn't want to sign anything."[2]

On February 6, 1997, Det. Neske and Det. Hanlen conducted a photo lineup with Stotler, who was still in the hospital. Stotler was unable to select anyone from the photo array. Stotler was prompted by the detectives to take his best guess about the intruder's identity. Stotler said it could have been the third or sixth person in the lineup. Irons was the third person in the lineup.

After Stotler's release from the hospital, he was prepared by the O'Fallon Police department to testify at Irons's preliminary hearing. Stotler was given a copy of the police reports and provided with a copy of the photo lineup. By the time of the preliminary hearing, Stotler had developed a detailed memory of the intruder's description, including

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]By the time of Irons's trial, Det. Hanlen was unable to testify because of a medical issue. Det. Hanlen's suppression hearing testimony was read, in part, to the jury.

8

detailed testimony about what the intruder wore and his facial features. The information Stotler recalled matched information in the police reports. During the March 26, 1997 preliminary hearing, Stotler positively identified Irons as the intruder in his home. This was the first time Stotler had been able to positively identify Irons.[3]

At trial, the case against Irons centered on Stotler's identification of Irons, Det. Hanlen's testimony about Irons's confession, and testimony of witnesses who placed Irons in Stotler's neighborhood and who reported seeing Irons with a gun that looked similar to a gun later found by a confidential informant. Irons's defense was that he did not commit the crime, and that someone else had to have committed the crime.

Irons was convicted. On direct appeal, Irons claimed error in the admission of his acknowledgement and waiver of rights form; in permitting the prosecutor to act as an unsworn witness; in permitting implicit comment on Irons's exercise of his right not to testify at trial; in permitting the admission of hearsay; and in permitting the State to violate the witness exclusion rule. Irons's convictions were affirmed. *State v. Irons*, 17 S.W.3d 574 (Mo. App. E.D. 2000).

Irons file a timely Rule 29.15 motion. The Rule 29.15 motion did not allege a *Brady* violation. The Rule 29.15 motion was denied, and the denial was affirmed on appeal. *Irons v. State*, 72 S.W.3d 619 (Mo. App. E.D. 2002). Irons thereafter unsuccessfully sought federal habeas corpus relief.

---

[3]Stotler later testified in a deposition that he believed he correctly identified Irons as the intruder during the preliminary hearing because he read "State of Missouri v. Jonathan Irons" on the door outside the courtroom.

**The State's Arguments Challenging the Judgment**

Irons's first amended petition for a writ of habeas corpus claimed, and the habeas court found, that in 2009, more than a decade after Irons's convictions, advocates working on Irons's behalf located a latent fingerprint report in the O'Fallon police department's file that had not been disclosed to Irons before his trial. Irons claimed, and the habeas court found, that the undisclosed fingerprint report would have provided Irons with forensic evidence that an identifiable fingerprint[4] located at the crime scene belonged to someone other than Stotler or Irons. Irons claimed, and the habeas court found, that although a latent fingerprint report had been disclosed to Irons before trial, that report showed only that none of the identifiable fingerprints found at the scene belonged to Irons. The habeas court found that the undisclosed fingerprint report was exculpatory and had been suppressed to Irons's prejudice, requiring habeas relief.

The State's petition for writ of certiorari raises two challenges to the habeas court's grant of habeas relief, both of which argue that the habeas court exceeded or abused its authority. First, the State contends that the *Brady* violation found by the habeas court was procedurally defaulted. Second, the State argues that there was insufficient evidence that a latent fingerprint report had been suppressed, and that in any event, the information in the purportedly suppressed report was not exculpatory or prejudicial.

---

[4]An "identifiable" fingerprint is one that is of a quality that can be used to identify to whom it belongs, most commonly by running the fingerprints through the Missouri State Highway Patrol's Automated Fingerprint Identification System ("AFIS").

**A.**

**Irons's Procedurally Defaulted *Brady* Claim Could Be Raised in his Habeas Proceeding Pursuant to the Cause and Prejudice Exception**

The State correctly notes that "habeas corpus is not a substitute for appeal or post-conviction proceedings," and that claims not raised on direct appeal or in a timely filed post-conviction motion are procedurally defaulted. *State ex rel. Simmons v. White*, 866 S.W.2d 443, 446 (Mo. banc 1993); *see also State ex rel. Strong v. Griffith*, 462 S.W.3d 732, 733-34 (Mo. banc 2015). However, there are three limited exceptions to this rule, the application of any of which will permit habeas review of a procedurally defaulted claim: (1) that the claim alleges a trial court exceeded its authority; (2) that the claim involves "manifest injustice because newly discovered evidence makes it more likely than not that no reasonable juror would have convicted the [habeas] petitioner (a 'gateway of innocence claim');" or (3) that the claim involves the "presence of an objective factor external to the defense, which impeded the [habeas] petitioner's ability to comply with the procedural rules for review of claims, and which has worked to the petitioner's actual and substantive disadvantage infecting his entire trial with error of constitutional dimensions (a 'gateway cause and prejudice' claim)." *McElwain*, 340 S.W.3d at 244-45.

Here, the habeas court relied on the gateway of cause and prejudice to review Irons's procedurally defaulted claim of a *Brady* violation based on an undisclosed latent fingerprint reports. "If a habeas record establishes a showing of the gateway of cause and prejudice, then the habeas court is entitled to review the merits of constitutional claims associated with that showing." *Id*. at 244.

11

The State's writ of certiorari challenges only whether the "cause" prong of the "cause and prejudice" exception was established by the habeas record. The State acknowledges that when the procedurally defaulted claim raised by a habeas petitioner is a *Brady* violation, the State's improper suppression of information usually qualifies as "cause" because it is an objective factor external to the defense. *See State ex rel. Clemmons v. Larkins*, 475 S.W.3d 60, 76 (Mo. banc 2015). The State argues, however, that the alignment between the State's suppression of information and an objective "cause" external to the defense is overcome where a habeas petitioner had reason to know about the suppressed information in time to raise a *Brady* claim on direct appeal or in a timely filed post-conviction motion. The State is correct, as the "cause" prong of the cause and prejudice exception requires a showing that the objective "cause" external to the defense impeded the habeas petitioner's ability to comply with procedural rules for timely review of a claim. *McElwain*, 340 S.W.3d at 245.

The State argues that even presuming the latent fingerprint report located by Irons's advocates in 2009 had not been disclosed to Irons before his trial, Irons nonetheless had enough information by the time his trial was over to have known that there was an undisclosed fingerprint report. Specifically, the State is referring to the trial testimony of Det. Luetkenhaus.

The habeas court found Det. Luetkenhaus's trial testimony to be misleading. Pursuant to our standard of review, we are bound by this factual finding. It is worth noting, however, that the habeas court's factual finding is supported by a cursory review of the record.

12

At trial, Det. Luetkenhaus testified on direct examination about the latent fingerprints taken from the January 14, 1997 crime scene as follows:

Q:      Were you able or were you the one that tried to develop latent prints or was that somebody else in your department?

A:      At the residence?

Q:      Yes.

A:      Yes, sir, I did that.

Q:      Were you able to get any, what we call usable prints?

A:      Yes, sir, there were identifiable prints obtained from the residence.

Q:      ***And who were they identified as being the prints of?***

A:      ***As the prints of the victim.***

[Trial transcript, p. 141] This testimony unequivocally established that "they" (referring to the identifiable prints found at the residence on January 14, 1997) belonged to Stotler. Nothing about this testimony suggested that an identifiable print found at the January 14, 2007 crime scene belonged to anyone other than Stotler. This impression was not altered by Det. Luetkenhaus's cross examination:

Q:      You identify three latent prints or prints that were good enough for you to try and lift to try and compare and read; is that correct?

A:      Yes, there were three latent fingerprints seized at the scene.

Q:      Where were those seized from?

A:      The interior of the front storm door.

Q:      All three of them?

A:      Yes ma'am.

13

Q:     Okay.  And you compared those to Mr. Irons'[s]?

A:     Yes I did.

. . . .

Q:     Okay.  Did you write a report regarding that?

A:     Yes, ma'am, I did.

Q:     I am going to show you what has been marked as defendant's exhibit I and ask you if you recognize that?

A:     Yes, I do.

Q:     And what is it?

A:     It's a latent print report generated by my office.

Q:     And does it have your signature at the bottom of it?

A:     Yes, it does.

Q:     What is the date of that report?

A:     10-29-97.

Q:     Would that have been at or near the time you were asked to compare those three latent prints to Mr. Irons?

A:     Yes, it was the date.

Q:     Okay.  And you also --- what's the result of that report or what's the conclusion on that?

A:     The latent fingerprints that were identifiable from the residence did not match to Jonathan Irons.

14

[Trial transcript, pp. 143-45] This trial testimony characterized the latent fingerprint report in Irons's counsel's possession as a report prepared for the purpose of ruling Irons out as the source of the identifiable fingerprints found at the crime scene.

The latent fingerprint report Irons's counsel used during Det. Luetkenhaus's cross-examination introduced at trial included the following information:

| Latent No. | List of Latents | Results of Comparison |
|---|---|---|
| | Interior smooth glass of front storm door above handle posistion | Identifiable x 2 |

| Elimination Prints Submitted on the Following: | Latents Identified to this subject: |
|---|---|
| Irons, Jonathon | None 10-29-97 |

This version of the latent fingerprint report indicates: (i) that the latent fingerprints lifted from the crime scene were "Identifiable x 2;" and (ii) that the report was run to eliminate Irons as the source of the identifiable fingerprints. When coupled with Det. Luetkenhaus's direct examination testimony that the identifiable prints found at the crime scene were "the prints of the victim [Stotler]," the evidence at trial established that the identifiable prints found at the scene did not belong to Irons, but did belong to Stotler. It would not be reasonable to attribute to Irons a reason to know about an undisclosed version of the latent fingerprint report which established that an identifiable fingerprint found at the crime scene belonged to someone other than Stotler.

The State nonetheless seizes on the variance between the latent fingerprint report used by Irons's counsel at trial, (which did not identify the source of the two identifiable

15

fingerprints found at the scene), and Det. Luetkenhaus's trial testimony which identified the identifiable prints found at the crime scene as Stotler's. The State argues this variance should have put Irons on notice that an undisclosed version of the fingerprint report existed. This argument is disingenuous and misses the point.

First, the State's argument ignores that when presented with a copy of the disclosed fingerprint report, Det. Luetkenhaus testified it had been prepared to rule out Irons as the source of the fingerprints found at the crime scene. Det. Luetkenhaus's testimony that identifiable fingerprints found at the scene belonged to Stotler was not inconsistent with a fingerprint report prepared for this limited purpose.

Second, even if Det. Luetkenhaus's testimony should have put Irons on notice of an undisclosed fingerprint report, at best it would have put Irons on notice about an undisclosed report that identified Stotler as the source of the identifiable fingerprints found at the scene. An undisclosed fingerprint report of this nature would have lent nothing to Irons's defense that a person other than Irons committed the crime.

Finally, it is now plain, given the information in the undisclosed fingerprint report, (set forth, *infra*), that Det. Luetkenhaus's direct examination testimony attributing all of the identifiable fingerprints found at the crime scene to Stotler *was not truthful*. The State's reliance on untruthful trial testimony to argue that Irons should have known at the time of trial about an undisclosed fingerprint report establishing that an unknown person left an identifiable fingerprint at the crime scene borders on the incredulous.

16

The habeas court did not exceed or abuse its authority when it concluded that the "cause" prong of the cause and prejudice exception was established by the habeas record.[5] We reject the State's argument that Irons's *Brady* claim involving an undisclosed latent fingerprint was procedurally defaulted and not subject to the cause and prejudice exception as to permit its assertion in Irons's first amended habeas petition.

## B.

### Sufficient Evidence Established a *Brady* Violation

The State's second argument is that the habeas court exceeded and abused its authority because Irons presented insufficient evidence that a latent fingerprint report was not disclosed, and that in any event, the information in the purportedly undisclosed report was not exculpatory or material. This argument challenges whether the essential elements of a *Brady* violation were established by the habeas record.

To prevail on a *Brady* claim, Irons was required to establish three essential elements: (1) that evidence purportedly suppressed was favorable to him because it is either exculpatory or impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that he was prejudiced by the suppression. *State ex rel. Engel v. Dormire*, 304 S.W.3d 120, 126 (Mo. banc 2010).

---

[5]We note, again, that in its writ of certiorari, the State does not challenge the habeas court's finding with respect of the "prejudice" prong of the cause and prejudice exception. As we discuss, *infra*, when a procedurally defaulted claim involves a *Brady* violation, the prejudice required to establish the cause and prejudice exception, and the prejudice required to establish a *Brady* violation warranting habeas relief, are co-extensive. *State ex rel. Engel v. Dormire*, 304 S.W.3d 120, 126 (Mo. banc 2010).

17

Before addressing whether these essential elements were established by the habeas record, it is necessary to describe the relevant content of the undisclosed version of the latent fingerprint report:

| Latent No. | List of Latents | Results of Comparison |
|---|---|---|
| | Interior smooth glass of front storm door above handle posistion | Ident to Stanley Stotler Left Index Fingcr |

| Elimination Prints Submitted on the Following: | Latents Identified to this subject: |
|---|---|
| Irons, Jonathon | None 10-29-97 |
| Stotler, Stanley C. | A1 Identified to Stanley Stotler Left Index finger |

This version of the latent fingerprint report varies from the fingerprint report introduced at trial in two obvious ways. First, this version of the fingerprint report includes in the "Results of Comparison" box "Ident to Stanley Stotler Left Index Finger." In contrast, the version of the fingerprint report introduced at trial said "Identifiable x 2" in the same box. Second, this version of the report includes an additional row of information under the section titled "Elimination Prints Submitted on the Following: Latents Identified to this subject:" that does not appear on the version of the fingerprint report introduced at trial. That row identifies "Stotler, Stanly C.," and describes the latent print as "A1 identified to Stanley Stotler Left Index finger."

Irons would reasonably conclude from reading the version of the fingerprint report used by him at trial that there were two identifiable fingerprints found at the scene; that the report was run for the purpose of eliminating him as the source of the identifiable fingerprints; that none of the identifiable fingerprints belonged to him; and that the

18

identifiable fingerprints found at the scene were not identified as to source in the report. Any ability Irons might have had at trial to exploit the fact that the report in his possession did not identify the source of the two identifiable fingerprints found at the crime scene was eviscerated, however, by Det. Luetkenhaus's direct examination testimony that "they" (referring to the identifiable prints found at the crime scene) all belonged to Stotler.

A person reading the undisclosed version of the fingerprint report would reasonably conclude that there were two identifiable fingerprints found at the scene; that the report was run for the purpose of eliminating both Irons and Stotler as the source of the identifiable fingerprints; that none of the identifiable fingerprints belonged to Irons; that one of the two identifiable fingerprints (print A1) belonged to Stotler; and that one of the two identifiable fingerprints belonged to an unidentified person other than Stotler or Irons. A person reading the undisclosed version of the fingerprint report would also know that Det. Luetkenhaus's direct examination testimony attributing all identified fingerprints found at the scene to Stotler was not truthful.

With the relevant content of the undisclosed version of the fingerprint report in mind, we turn to whether the essential elements of a *Brady* violation are established by the habeas record. We begin our discussion with the second essential element--whether the second fingerprint report was suppressed.

### *The second version of the fingerprint report was not disclosed*

The State's writ of certiorari argues that insufficient evidence established that the latent fingerprint report found by Irons's advocates in 2009 was undisclosed to Irons before

19

his trial, and highlights evidence from which a contrary assertion could be inferred.[6] However, the habeas court made express factual findings to the contrary, and in the process, explained the evidence and testimony on which it relied to reach its findings. The habeas court found that: (i) "[p]rior to trial, the only fingerprint report turned over to defense counsel indicated that there were unidentified fingerprints collected from the crime scene;" (ii) that the second fingerprint report "was not turned over to the defense prior to trial;" and (iii) that the second fingerprint report was not discovered by Irons until advocates on his behalf made a Sunshine Law request in 2007 seeking records from the O'Fallon Police Department, and subsequently reviewed the records secured from the Sunshine Law request. The State's challenge to these factual findings, which is framed as a sufficiency of the evidence challenge, and which highlights evidence that could have supported a different conclusion, is not cognizable given our standard of review. *Green*, 388 S.W.3d at 606 (holding that in a writ of certiorari reviewing the grant of a writ of habeas corpus "we do not review findings of fact") (citing *Sprick*, 59 S.W.3d at 518). Notably, the State does not argue that as a matter of law, *no* evidence exists to support the habeas court's factual finding that the second version of the fingerprint report was not disclosed. We are

---

[6]Specifically, the State relies on the testimony of Chris Horn ("Horn"), an investigator with the Attorney General's office, who claimed that in reviewing Irons's trial counsel's file, he located a copy of the second version of the fingerprint report, though it had been redacted, likely by covering a part of the report while photocopying, to "*remove*" the row of information on the report that stated fingerprint A1 belonged to Stotler's left index finger. The State ignores, however, that the habeas court expressly found that to the extent Horn's testimony conflicted with that of Irons's advocate (who found the second version of the fingerprint report in the O'Fallon police department file sometime in or after 2007), and Irons's trial counsel (who testified that the only version of the fingerprint report she ever had was the one she introduced at trial), "the Court resolves this credibility determination in favor of [Irons's advocate] and [Irons's trial counsel] and finds that this report was not known to trial counsel and was not known to [Irons] or his agents until it was discovered . . . in 2007." [Judgment, p. 27]

bound by the habeas court's factual findings, and thus conclude that the second essential element of a *Brady* violation is established by the habeas record.

### The undisclosed version of the fingerprint report was favorable to Irons because it was both exculpatory and impeaching

With respect to the first essential element of a *Brady* violation, the State argues the undisclosed fingerprint report was not exculpatory. The State argues that knowing that Stotler's fingerprint was identified as one of the latent fingerprints lifted from the crime scene would not have aided Irons in his defense. While that is indeed true, the undisclosed fingerprint report would also have established that the second identifiable fingerprint found at the crime scene belonged to someone other than Irons or Stotler. This is plainly exculpatory information, as it would have afforded Irons with forensic evidence supporting an argument that a third person was at the scene on the day of the crime, bolstering his general contention that he did not commit the crime. It was one thing for Irons to know that identifiable fingerprints found at the scene did not belong to him. It would have been quite another thing for Irons to know that an identifiable fingerprint found at the crime scene belonged to person other than Irons and Stotler. Forensic evidence that a third person was at the scene is exculpatory and far more persuasive than simply arguing the negative inference that because Irons's prints were not found at the scene, he could not have committed the crime.

Moreover, the undisclosed fingerprint report would have provided Irons with a basis to impeach Det. Luetkenhaus's direct examination testimony that all of the identifiable prints found at the scene belonged to Stotler. As we have already discussed, Det.

21

Luetkenhaus's untruthful direct examination testimony eviscerated any ability Irons otherwise would have had to exploit the fact that the fingerprint report he used at trial was silent with respect to identifying the source of the two identifiable fingerprints found at the crime scene.

The habeas record supports that Irons established the first essential element of a *Brady* violation.

### *Irons was prejudiced by the undisclosed report*

The third essential element of a *Brady* violation is that the undisclosed information resulted in prejudice. Undisclosed evidence results in prejudice if the evidence is material to the habeas petitioner's case. *Engel*, 304 S.W.3d at 128 (Mo. banc 2010).

> The materiality standard for *Brady* claims is established when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 434.

*Engel*, 304 S.W.3d at 128. If there is a "'reasonable probability'" that the outcome of a criminal proceeding would have been different, then the suppressed evidence "'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). If materiality is established by this standard, then "'the suppression . . . violates due process . . . irrespective of the good faith or bad faith of the prosecution.'" *Merriweather v. State*, 294 S.W.3d 52, 54 (Mo. banc 2009) (quoting *Brady*, 373 U.S. at 87). The prejudice analysis required for a *Brady* claim is co-extensive with the "prejudice" prong in the cause and prejudice exception permitting assertion of a

22

procedurally defaulted *Brady* claim in a habeas proceeding. *Engel*, 304 S.W.3d at 126. "Consequently, so long as [a habeas petitioner] establishes the prejudice to support his *Brady* claims, he will have shown the required prejudice to overcome the procedural bar for habeas relief." *Id.*

We begin with the latter established principle. As noted, the State acknowledged that the habeas court relied on the cause and prejudice exception to overcome procedural default of Irons's *Brady* claim, and challenged *only* whether the habeas record supported finding the "cause" prong of this exception. No challenge has been asserted by the State to the habeas court's finding that the "prejudice" prong of the cause and prejudice exception was established by the habeas record. And the State has not asked us to treat its challenge to whether prejudice was established in connection with Irons's *Brady* claim as equally applicable to assessing applicability of the cause and prejudice exception. Pursuant to *Engel*, we could easily justify viewing the habeas court's unchallenged finding that the "prejudice" prong of the cause and prejudice exception was established as controlling on whether prejudice was established as an essential element of Irons's *Brady* claim. *Engel*, 304 S.W.3d at 126.

Even if we overlook this concern, we would not find that the habeas court exceeded or abused its authority when it determined that the undisclosed latent fingerprint report prejudiced Irons because it was material, and undermined confidence in the outcome of Irons's trial. As the habeas court noted, materiality is a fact-intensive assessment that "depends on 'the nature of the charge, the evidence presented by the State, and the role that the nonproduced evidence would likely have played.'" *Duley v. State*, 304 S.W.3d 158,

23

163 (Mo. App. W.D. 2009) (quoting *State v. Bebee*, 577 S.W.2d 658, 662 (Mo. App. S.D. 1979)).

The habeas court characterized the case against Irons as very weak and circumstantial. No fingerprints or DNA evidence linked Irons to the crime, and the only eyewitness to the crime, Stotler, provided an identification that was questionable, heavily influenced, and dotted with inconsistencies. Though witnesses saw Irons in Stotler's neighborhood near the time of the crime, Irons had several friends in that neighborhood, and the timeline provided by these witnesses, coupled with their locations a few blocks from Stotler's home, called into question how Irons could have broken into Stotler's basement window, and later encountered Stotler between 6:30 p.m. and 6:40 p.m. (when Stotler arrived home) and 6:42 p.m. (the time of Stotler's 911 call). Though Irons allegedly confessed to the crime in an interrogation conducted by Det. Hanlen, the circumstances of that undocumented interrogation, and the inability to authenticate the confession given Det. Hanlen's troubling interrogation practices renders the confession suspect.

As the habeas court noted, "'[i]f [a] verdict is already of questionable validity, additional evidence of [even] relatively minor importance might be sufficient to create reasonable doubt.'" *Wearry v. Cain*, 136 S.Ct. 1002, 1006 (2016) (quoting *United States v. Agurs*, 427 U.S. 97, 113 (1976)). Here, the habeas court found that the undisclosed fingerprint evidence would have given Irons "unassailable forensic evidence" to attack the State's case and to support his claim of innocence. We agree. As previously noted, it was one thing for Irons to claim that no one could prove he was at the crime scene. It would have been quite another thing for Irons to have been able to rely on forensic evidence

24

gathered by the police that proved an as yet unidentified person may have been at the crime scene. That evidence would have permitted Irons to effectively impeach Det. Luetkenhaus, and to emphasize the State's failure to conduct a thorough investigation, since both the disclosed and undisclosed versions of the fingerprint report reflect that *none* of the identifiable fingerprints found at the crime scene were run through AFIS.[7] That evidence, and the reasonable implication of suspect or incomplete investigative work, could reasonably have impacted the jury's acceptance of Stotler's identification of Irons, which evolved from Stotler's inability to provide any identifying information about the intruder on the day of the crime, to an ability by the time of the preliminary hearing to recall precise details about Irons's clothing and identifying personal characteristics that matched police reports and the photo lineup in Stotler's possession. The undisclosed evidence could reasonably have impacted the jury's willingness to accept Det. Hanlen's testimony about Irons's confession particularly in light of Det. Hanlen's revelations about the manner in which he conducted, and failed to document, interrogations. In short, based on our review of the habeas record, we cannot conclude that as a matter of law, the habeas court exceeded or abused its authority when it found that "the suppression of the fingerprint evidence, by itself, was material and requires a new trial."

The State quarrels with the habeas court's bolstering of this conclusion by reliance on other alleged "new evidence," including: (i) the existence of highly incriminating impeachment materials regarding Det. Hanlen's questionable police tactics that were the

---

[7]The habeas court ordered the identifiable latent fingerprint found at the crime scene, but not attributable to Stotler or Irons, to be run through AFIS. Unfortunately, the latent print was not of sufficient quality to permit a comparison, an outcome likely influenced by the fact the latent fingerprint was nearly twenty-four years old.

subject of Irons's undetermined *Brady* claim; (ii) a report from a newly identified expert that was highly critical of the photo line-up put together by the police from which Stotler identified two possible suspects, one of whom was Irons; (iii) the existence of another witness account whose timeline of reported sightings of Irons on the day of the crime would have made it impossible for him to commit the crime; (iv) and the fact that in hindsight, trial counsel agreed she should have objected to admission into evidence of the gun turned over to Det. Luetkenhaus by a confidential informant when that gun had absolutely no established connection to the crime. We need not address the State's challenges to the habeas court's reliance on this additional evidence, however. The additional evidence was only referred to by the habeas court to bolster the conclusion it had already reached--that suppression of the fingerprint report identifying Stotler as the source of only one of the identifiable prints found at the crime scene was, by itself, material, and warranted a new trial. As the habeas court noted in the Judgment:

> Had the defense been apprised of the existence of the undisclosed fingerprint report, a far stronger alternative perpetrator/mistaken identity defense could have been presented by [Irons] to the jury at his trial. Since the undisclosed report would have been an essential piece of evidence to support [Irons's] defense, this suppressed report was critical exculpatory evidence that undermines confidence in the jury verdict.

The habeas court did not exceed or abuse its authority in reaching this conclusion.

## Conclusion

The habeas court did not exceed or abuse its authority in concluding on this habeas record that Irons established the gateway exception of cause and prejudice, permitting the habeas court to entertain Irons's procedurally defaulted claim of a *Brady* violation based

on an undisclosed latent fingerprint report. The habeas court did not exceed or abuse its authority in concluding on this habeas record that Irons established the essential elements of a *Brady* violation based on an undisclosed latent fingerprint report. As a result, the habeas court did not exceed or abuse its authority in concluding on this habeas record that Irons established a violation of his due process right to a fair trial, warranting the issuance of a writ of habeas corpus.

As a result, we refuse to quash the record of the habeas court. Irons's St. Charles County convictions of first degree assault, armed criminal action, and first degree burglary in case number CR197-271FX are vacated. The State[8] must formally announce its intention to retry Irons for these charged offenses within ten (10) days of the issuance of our mandate or Irons shall be immediately discharged from the State's custody without the need for a further order from this, or any other court.

_Cynthia L. Martin_
Cynthia L. Martin, Judge

All concur

---

[8]The St. Charles County Prosecutor's Office represents the State's interests in connection with the charges pending against Irons, and is the office authorized to make this decision.